Sarah McMillan (MT Bar # 3634)
WESTERN ENVIRONMENTAL LAW CENTER
P.O. Box 7435
Missoula, Montana 59807
(p) 406.728.5096
(f) 406.443.6305
mcmillan@westernlaw.org

Erik Schlenker-Goodrich (NM Bar #17875)
*admission pro hac vice pending*
WESTERN ENVIRONMENTAL LAW CENTER
208 Paseo del Pueblo Sur #602
Taos, New Mexico 87571
(p) 575.613.4197
(f) 575.751.1775
eriksg@westernlaw.org

Counsel for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| MONTANA ENVIRONMENTAL INFORMATION CENTER, EARTHWORKS' OIL AND GAS ACCOUNTABILITY PROJECT, and WILDEARTH GUARDIANS,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES BUREAU OF LAND MANAGEMENT, an agency within the U.S. Department of the Interior, KENNETH L. SALAZAR, in his official capacity as Secretary of the Interior, JAMIE CONNELL, in her official capacity as State Director of the Bureau of Land Management's Montana State Office, and THERESA M. HANLEY, in her official capacity as Deputy State Director of the Bureau of Land Management's Montana State Office,<br><br>Federal Defendants. | Case No.  CV-11-26-M-DWM<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

I.    **INTRODUCTION**

1.    MONTANA ENVIRONMENTAL INFORMATION CENTER,
EARTHWORKS' OIL AND GAS ACCOUNTABILITY PROJECT, and WILDEARTH
GUARDIANS ("Climate Hawks"), hereby bring this civil action for declaratory and injunctive
relief against the U.S. BUREAU OF LAND MANAGEMENT *et al*. ("BLM") in accord with the
Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*., for violations of the National
Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*. and NEPA's implementing
regulations and policies.

2.    The Climate Hawks' action arises out BLM's failure to carefully address climate
and energy concerns before selling and executing and, in certain instances, lifting a suspension
on, specific federal oil and gas leases in Montana. BLM's actions unacceptably fail to safeguard
the climate and, further, fail to address the waste of methane to the atmosphere caused by
inefficient oil and gas operations.

3.    BLM has not considered alternatives to ensure that climate disrupting pollution –
specifically, greenhouse gas ("GHG") pollution – is prevented or abated during leasehold
operations, has not acknowledged the significance of impacts caused by leasehold operations,
and has not taken a hard look at waste and inefficiency in the production of oil and gas.

4.    Waste and inefficiency in the production of oil and gas results in the emission of
methane to the atmosphere, a potent GHG 105 times as strong as carbon dioxide over a 20-year
time period, thus contributing to and exacerbating climate change. The emission of methane to
the atmosphere also reduces royalties to federal and state governments and, further, wastes
federal oil and gas resources that could otherwise be used by homes, schools, businesses, and
other consumers.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**Page 1 of 40**

**5.**     The Climate Hawks originally challenged BLM's decision to execute the 2008 oil and gas leases in *Mont. Envtl. Info. Ctr. v. BLM*, 08-CV-178 DWM. That challenge was resolved in a court-approved settlement agreement dated March 11, 2010. Pursuant to that settlement agreement, BLM suspended the 61 still-extant leases executed in 2008 and initiated a new round of environmental review. BLM has now completed that environmental review and lifted the suspension entirely on 45 leases, lifted the suspension in part on 2 leases, and maintained the suspension entirely on 6 leases to protect certain wildlife species. This action challenges BLM's decision to lift the suspension entirely on 45 leases and in part on 2 leases – an area totaling 25,329 acres – but does not challenge BLM's decision to maintain the suspensions on the other leases and those portion of the 2 leases remaining in suspension.

**6.**     BLM has used the environmental review triggered by the March 2010 settlement to justify future BLM oil and gas lease sales, including a lease sale held on December 9, 2010. As a result of this lease sale, BLM sold and executed 53 oil and gas leases in Montana totaling 33,257 acres. This action challenges BLM's decisions to sell and execute these 53 additional leases and to allow leases that were offered for sale but that did not receive bids at the December 9, 2010 lease sale to remain available for noncompetitive sale.

**7.**     If they prevail, Plaintiffs will seek an award of attorneys' fees, costs, and other expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

**II.     <u>JURISDICTION & VENUE</u>**

**8.**     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

**9.**     This action reflects an actual, present, and justiciable controversy between the Climate Hawks and BLM; the Climate Hawks have suffered adverse and irreparable injuries-in-

fact to the their legally-protected interests in the environment – an environment that is suffering from a warming, deteriorating climate – and to their related interests in responsible oil and gas development from BLM's decisions. These injuries are concrete and particularized and fairly traceable to BLM's challenged decisions, providing the requisite personal stake in the outcome of this controversy necessary for this Court's jurisdiction.

10.     The requested relief is authorized by 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706.

11.     The requested relief would redress the Climate Hawks' actual, concrete injuries caused by the BLM's failure to comply with duties mandated by NEPA and the regulations and policies promulgated pursuant to these federal statutes.

12.     The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, and 706.

13.     The Climate Hawks have exhausted any and all available and required administrative remedies.

14.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e). A substantial part of the events and omissions giving rise to this case occurred in BLM offices located in Montana, and this case involves, in part, Montana public lands, resources, and environmental interests.

## III.    PARTIES

15.     Plaintiff MONTANA ENVIRONMENTAL INFORMATION CENTER ("MEIC") is a 501(c)(3) nonprofit organization founded in 1973 with approximately 3,000 members throughout the United States and the State of Montana. MEIC is dedicated to the preservation and enhancement of the natural resources and natural environment of Montana and to the gathering and disseminating of information concerning the protection and preservation of

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**Page 3 of 40**

the human environment through education of its members and the general public concerning their rights and obligations under local, state and federal environmental protection laws and regulations. MEIC is also dedicated to assuring that federal officials comply with and fully uphold the laws of the United States that protect and enhance the environment from pollution. MEIC members have legally-protected interests and plan to continue to live in, use, and enjoy the communities and landscapes affected by the challenged BLM actions. MEIC brings this action on its own behalf and on behalf of its adversely affected members.

16.     Plaintiff EARTHWORKS' OIL AND GAS ACCOUNTABILITY PROJECT ("EARTHWORKS' OGAP"), through its parent, is a 501(c)(3) nonprofit dedicated to working with communities to reduce and prevent the devastating impacts of drilling, digging, and mining. EARTHWORKS' OGAP works with community groups, landowners, organizations, and individuals to protect our environment, public health, and communities. EARTHWORKS' OGAP provides technical, policy, and organizing assistance, and serves as a clearinghouse of information for organizations and individuals concerned with oil and gas development in Montana and the United States. EARTHWORKS' OGAP also advocates for responsible oil and gas development to protect the public interest as well as the interests of EARTHWORKS' OGAP and its members. EARTHWORKS' OGAP's members live in, use, and enjoy the communities and landscapes affected by the challenged BLM actions. EARTHWORKS' OGAP brings this action on its own behalf and on behalf of its adversely affected members.

17.     Plaintiff WILDEARTH GUARDIANS is a non-profit corporation with more than 9,000 members and supporters throughout the United States, including more than two-dozen in Montana. WILDEARTH GUARDIANS protects and restores wildlife, wild rivers, and wild places in the American West. WILDEARTH GUARDIANS is dedicated to protecting the

American West from the dangers it faces from the climate crisis. WILDEARTH GUARDIANS members and staff have recreational, aesthetic, scientific, professional, and spiritual interests in a protected climate and the environment that is sustained by a protected climate. WILDEARTH GUARDIANS members use and plan to continue to live in, use, and enjoy the communities and landscapes affected by the challenged BLM actions. WILDEARTH GUARDIANS brings this action on its own behalf and on behalf of its adversely affected members.

18.     The Climate Hawks and their members have concrete and particularized interests in the production and use of oil and gas, the emission and reduction of GHG pollution from oil and gas production and use, and the protection of the land, air, water, and communities impacted by oil and gas leasing and development and, increasingly, climate change.

19.     The Climate Hawks' and their members' interests are deeply rooted in the communities of the American West where the Climate Hawks and their members live. These interests are also deeply rooted in these communities' surrounding mountains, forests, grasslands, rivers, streams, wildlife, and other components of healthy, intact landscapes. The Climate Hawks' and their members use and enjoy these landscapes and their components on BLM and other lands in Montana and the Western U.S. for agriculture, hiking, boating, fishing, hunting, camping, photography, aesthetic enjoyment, spiritual contemplation, and other vocational, scientific, and recreational activities. The Climate Hawks' and their members also rely on these landscapes – in particular water – to support durable ranches and other economic activities and financial interests that they intend and hope to pass on, intact, to their children and their children's children.

20.     The Climate Hawks' and their members' interests are protected by a stable climate and the responsible development and use of energy. Conversely, these interests are

adversely impacted by GHG pollution, the consequent deterioration and increased instability of the climate, with its resulting impacts to the environment, as well as the irresponsible development of energy resources. Such adverse impacts threaten actual, imminent, concrete, and particularized harm to the Climate Hawks' and their members' interests.

21.     GHG pollution, by contributing to climate change, causes a host of impacts, including but not limited to the disruption of hydrological cycle, decreases in winter snowpack, degradation of glaciers, earlier snowmelt and flooding, and reduced river and stream levels during dry months. This, in turn, increases the risk of wildfire, harms agriculture, harms the connection between communities and their surrounding landscapes, and, harms the components of these communities and landscapes. Increased degradation of the landscape also constricts and alters wildlife habitat, forcing species to migrate to more durable, adequate habitat and, in some instances, eliminating in situ populations, such as of aquatic species, that cannot migrate. In so doing, GHG pollution harms the recreational, aesthetic, scientific, religious, and spiritual interests that are derived from and contingent on these communities and landscapes.

22.     Irresponsible energy development, through the placement of industrial infrastructure in communities and on the landscape, not only impacts these communities and landscapes directly, but also indirectly and cumulatively impairs the ability of these communities and landscapes to withstand climate change and other environmental stresses. Furthermore, if energy development were conducted responsibly, such that waste and inefficiencies were prevented, then more energy would be produced with less development, thus lessening the impact to the environment and reducing the demand for new leases and additional development.

23.     The impacts caused by GHG pollution, climate change, and irresponsible energy development – and the harm these impacts cause to the Climate Hawks' and their members'

interests – are supported and confirmed by a host of scientific studies and other information provided to and included within BLM's administrative record for the challenged decisions. This information is explicitly acknowledged by BLM in its decision-making documents. Furthermore, this information is reflected in various policy pronouncements by BLM and other Federal agencies. *See*, *e.g.*, Sec. Or. 3226 (Jan. 19, 2001); Sec. Or. 3289 (Sept. 14, 2009). As BLM's parent, the Department of the Interior, has noted "Climate change *is* affecting every corner of the American continent. It is making droughts drier and longer, floods more dangerous and hurricanes more severe … *The glaciers in Montana's Glacier National Park are melting so quickly, they're expected to disappear in the next two decades*." www.doi.gov/whatwedo/climate/index.cfm (emphasis added).

24.     The Climate Hawks' and their members will continue to live in their communities and will continue to use and enjoy these communities and their surrounding landscapes in Montana and the American West. The Climate Hawks' and their members will also continue to use and enjoy specific, particular landscapes – and their various components – across Montana and the American West frequently and on an ongoing basis in the future, including 2011 and 2012.

25.     The Climate Hawks and their members have procedural interests in BLM's full compliance with federal law before reaching the challenged decisions and selling and executing the challenged oil and gas leases. These procedural interests are grounded in the concrete and particularized interests that the Climate Hawks' and their members' have in the communities and landscapes of Montana and the American West that are impacted by GHG pollution, climate change, and irresponsible energy development.

26.     BLM oil and gas leases convey legal rights to the lessee, and thereby limit and

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**Page 7 of 40**

adversely injure the interests of the Climate Hawks and their members in communities and landscapes of Montana and the American West.

27.    The Climate Hawks' and their members' interests have been and will be adversely affected and irreparably injured by BLM's decisions and decision-making process for the challenged oil and gas leases. These are actual, concrete injuries caused by and traceable to BLM's actions – actions that fail to comply with federal law and will contribute to increased atmospheric GHG concentrations, further warm our planet, destabilize our climate, and adversely impact the communities and landscapes of Montana and the American West. The Climate Hawks and their members are similarly affected and injured by the waste and inefficient production of energy resources. Such waste not only impacts the environment through climate change, but also increases the pressure to develop more oil, gas, and other energy resources to satisfy U.S. and world energy demands.

28.    The relief sought by the Climate Hawks would help remedy the injuries suffered by the Climate Hawks and their members. BLM would be required to revisit the challenged leasing decisions and to take action to meaningfully evaluate and prevent or abate GHG pollution and methane waste before selling and executing oil and gas leases or making further decisions regarding these leases. Such action would slow or reduce climate change and its impacts and, further, through improved production efficiency, reduce the pressure to lease and develop additional oil, gas, and other energy resources. Such relief could also spark broader-scale reform that would amplify the benefits of this litigation.

29.    Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an agency within the United States Department of the Interior and is responsible for managing public lands and resources in Montana, including federal onshore oil and gas resources and the

leasing program for those resources, and, in that capacity, is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

30.     Defendant KENNETH L. SALAZAR is the Secretary of the United States Department of the Interior and is responsible for managing Montana's BLM public lands and resources, including federal onshore oil and gas resources and the leasing program for those resources, and, in that official capacity, is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

31.     Defendant JAMIE CONNELL is State Director of the Bureau of Land Management in Montana and is responsible for managing Montana's BLM public lands and resources and, in that official capacity, is responsible for implementing and complying with federal law, including the federal laws implicated by this action. Ms. CONNELL signed BLM's decision rejecting the Climate Hawks' protest of the December 9, 2010 oil and gas lease sale and causing the execution of the 2010 oil and gas leases.

32.     Defendant THERESA M. HANLEY is the Montana Deputy State Director of the Bureau of Land Management, Division of Resources, and is responsible for managing Montana's BLM public lands and resources, and, in that official capacity, is responsible for implementing and complying with federal law, including the federal laws implicated by this action. Ms. HANLEY approved the Findings of No Significant Impact and Decision Records lifting the suspension of the 2008 oil and gas leases and providing for the sale and execution of the 2010 oil and gas leases.

IV.     **OPERATIVE FACTS**

A.     **CLIMATE CHANGE**

33.     Climate change is caused by the concentration of GHGs in the atmosphere. GHGs

trap heat within the atmosphere and thereby warm the Earth, making it livable. But just as a blanket can provide necessary warmth, so to can a blanket provide too much warmth, smothering life beneath it. Since the advent of the industrial revolution, atmospheric GHG concentrations have increased rapidly and dramatically from historical levels, a rise that corresponds to and is caused by years of human activity, in particular industrial fossil fuel production and use. As a result, human-caused GHG pollution, by contributing to atmospheric GHG concentrations, has caused, is now causing, and will continue to cause the adverse disruption and deterioration of the climate that has otherwise remained remarkably stable and sustained civilization for millennia.

34.     The Intergovernmental Panel on Climate Change defines GHGs as:

those gaseous constituents of the *atmosphere*, both natural and *anthropogenic*, that absorb and emit radiation at specific wavelengths within the spectrum of *infrared radiation* emitted by the Earth's surface, the atmosphere, and clouds. This property causes the *greenhouse effect*. Water vapor (H2O), *carbon dioxide* (CO2), *nitrous oxide* (N2O), *methane* (CH4), and *ozone* (O3) are the primary greenhouse gases in the Earth's atmosphere. Moreover there are a number of entirely human-made greenhouse gases in the atmosphere, such as the *halocarbons* and other chlorine- and bromine-containing substances, dealt with under the *Montreal Protocol*. Besides CO2, N2O, and CH4, the *Kyoto Protocol* deals with the greenhouse gases *sulfur hexafluoride* (SF6), *hydrofluorocarbons* (HFCs), and *perfluorocarbons* (PFCs).

35.     Each GHG has a "global warming potential" ("GWP"). As a Supplemental Information Report prepared in 2010 for BLM to inform BLM's challenged decisions states, GWP "accounts for the intensity of each GHG's heat trapping effect and its longevity in the atmosphere" and "provides a method to quantify the cumulative effect of multiple GHGs released into the atmosphere by calculating carbon dioxide equivalent (CO2e) for the GHGs."

36.     GHG emissions to the atmosphere are cumulative. Every metric ton of CO2e emitted to the atmosphere from a small source is equally as damaging to the climate as a metric ton of CO2e from a large source. Put differently, there is no single source of GHG pollution that

is the sole and exclusive, or even primary, cause of climate change. It is, instead, a textbook example of a cumulative impacts problem.

37.     The necessary solution to climate change is simple: prevent or abate anthropogenic GHG pollution.

38.     The Environmental Protection Agency's ("EPA's") 2010 GHG Inventory assumes that the GWP of methane is 21 times that of carbon dioxide over a 100-year time period, a figure based on the Intergovernmental Panel on Climate Change's 2002 Second Assessment Report.

39.     According to the Intergovernmental Panel on Climate Change's 2007 Fourth Assessment Report, methane is 72 times more potent a warming agent than carbon dioxide over a 20-year time period, and 25 times more potent than carbon dioxide over a 100-year time period.

40.     Shindell *et al.*, *Improved Attribution of Climate Forcing to Emissions*, Science 2009 326 (5953), p. 716, concluded that methane is a more potent warming agent than previously assumed by the Intergovernmental Panel on Climate Change. When interactions between methane and aerosols in the atmosphere are accounted for, Shindell *et al.* found that methane has a warming potential 105 times as potent as carbon dioxide over a 20-year time period, and 33 times as potent over a 100-year time period.

41.     The impacts caused by climate change have been studied and acknowledged at the global, national, regional, and, increasingly, local scale.

42.     Climate change has caused, is causing, and will continue to cause impacts to the environment at the global, national, regional, and local scale.

43.     Climate change, if not mitigated through the prevention and abatement of human-caused GHG pollution, will cause further, intensifying, and potentially catastrophic, impacts.

44.     Dr. James Hansen, in 2008, explained that:

Paleoclimate evidence and ongoing global changes imply that today's $CO_2$, about 385 ppm, is already too high to maintain the climate to which humanity, wildlife, and the rest of the biosphere are adapted. Realization that we must reduce the current $CO_2$ amount has a bright side: effects that had begun to seem inevitable, including impacts of ocean acidification, loss of fresh water supplies, and shifting of climatic zones, may be averted by the necessity of finding an energy course beyond fossil fuels sooner than would otherwise have occurred.

We suggest an initial objective of reducing atmospheric $CO_2$ to 350 ppm, with the target to be adjusted as scientific understanding and empirical evidence of climate effects accumulate.

**45.** Dr. James Hansen, in 2009, warned that Earth "is dangerously near a tipping point at which human-made greenhouse gases reach a level where major climate changes can proceed mostly under their own momentum…." Dr. Hansen warned that if we do not "move to a fundamentally different energy pathway within a decade … it will be too late for one-third of the world's animal and plant species and millions of the most vulnerable members of our own species."

**46.** Montana Governor Brian Schweitzer has explained that:

Montana has been locked in the grip of a drought for most of the past two decades. During that time, we have seen some of the lowest precipitation levels in the state's recorded history, and Montana is not alone in this suffering. Most Western states find themselves in the same situation. Chronic drought has severely impacted our lake levels, our crop and livestock production, our forests, our fish and wildlife resources, and our tourism industry. I am very concerned about the connection these conditions have to global climate change, and ultimately the effect they will have on Montana's short and long-term future.

**47.** The Intergovernmental Panel on Climate Change, in its Fourth Assessment Report, has determined that "[w]arming of the climate system is unequivocal" and, further, that "[o]bservational evidence from all continents and most oceans shows that many natural systems are being affected by regional climate changes, particularly temperature increases."

**48.** The Intergovernmental Panel on Climate Change, in its Fourth Assessment Report, has identified numerous observed and future impacts to the environment from global

warming including temperature increases, degradation of terrestrial and aquatic ecosystems, increased risk of species extirpation, and negative impacts to ecosystem goods and services, such as food and water supply.

49.     The U.S. Global Change Research Program has published several reports identifying and evaluating climate change impacts to water resources, ecosystems, agriculture and forestry, and other resources in the United States.

50.     The Department of the Interior stated, in Secretarial Order 3226, *Evaluating Climate Change Impacts in Management Planning* (January 19, 2001), that "[t]here is a consensus in the international community that global climate change is occurring and that it should be addressed in governmental decision making."

51.     The Government Accountability Office, in a 2007 report entitled *Climate Change: Agencies Should Develop Guidance for Addressing the Effects on Federal Land and Water Resources* ("2007 GAO Report") concluded that the Department of the Interior had not provided specific guidance to implement Secretarial Order 3226, that officials were not even aware of Secretarial Order 3226, and that Secretarial Order 3226 had effectively been ignored.

52.     The 2007 GAO Report identified a myriad of substantial and specific environmental impacts to federal public lands including "drought, floods, glacial melting, sea level rise, and ocean acidification."

53.     The Department of the Interior states, in Secretarial Order 3289, *Addressing the Impacts of Climate Change on America's Water, Land, and Other Natural and Cultural Resources* (Sept. 14, 2009), that it is "taking the lead in protecting our country's water, land, fish and wildlife, and cultural heritage and tribal lands and resources from the dramatic effects of climate change that are already occurring – from the Arctic to the Everglades." Secretarial Order

3289 further states that "The realities of climate change require us to change how we manage the land, water, fish and wildlife, and cultural heritage and tribal lands and resources we oversee."

54.     The Department of the Interior, on its website, states that "[c]limate change is driving rapid and broad changes across the United States and the world." The website further provides: "As the nation's primary land, water and wildlife manager, the U.S. Department of the Interior has an obligation to address the impacts that climate change is having on America's resources by developing effective adaptation and mitigation strategies."

55.     Scientists with the Department of the Interior's United States Geological Survey predict that Montana's own Glacier National Park, a UNESCO World Heritage Site, will lose its glaciers by 2030. Indeed, the park has recently lost two more glaciers, leaving a mere 25 glaciers out of a historic baseline of 150 glaciers.

56.     "The American West has heated up even more than the world as a whole" and "in the five latest years" experienced warming "70 percent[] more than the overall planet's warming," according to a report in 2008 entitled *Hotter and Drier: The West's Changed Climate* published by the Rocky Mountain Climate Organization and Natural Resources Defense Council. This report details how the American West is getting drier, how climate change is disrupting ecosystems, and how warmer temperatures adversely affect business, recreation, and tourism.

57.     Scientists have "demonstrat[ed] statistically that the majority of the observed low frequency changes in the hydrological cycle (river flow, temperature, and snow pack) over the western U.S. from 1950-1999 are due to human-caused climate changes from greenhouse gases and aerosols." Barnett, Tim P., *et al.*, *Human-induced changes in the hydrology of the western United States*, revised version submitted to the Journal *Science* January 10, 2008, and published in *Science Express* January 31, 2008.

58.     A 2000 report by the Pew Center on Global Climate Change determined that "existing climatic conditions in many areas will become unsuitable for the species that currently live there, requiring them to migrate to survive…." This report also found that "global warming has the potential to create a 'winnowing' or 'filtering' effect similar to the reduction in biodiversity sometimes observed during human development."

59.     A 2004 Report by the Pew Center on Global Climate Change ("2004 Pew Report") determined that "human-induced global warming has the potential to severely exacerbate the outcomes of already high levels of stress on ecosystems."

60.     Anticipated impacts of global warming to wild plants, animals, and ecological processes identified in the 2004 Pew Report include: (1) evolutionary changes; (2) physical and physiological changes; (3) phenological changes; (4) range shifts; (5) community changes; and (6) ecosystem process changes. Such changes complicate species survival because "a variety of other anthropogenic forces are simultaneously stressing natural systems" and "[t]he net result of these pressures is that biological systems may already be in the early stages of a major extinction event that could result in the global loss of one-third of all species by 2100."

61.     The 2004 Pew Report determined that the ability of species to adapt to climate change could be compromised by the influence of "[m]odern, human-dominated landscapes."

62.     GHG pollution can contribute to localized air quality problems; local carbon dioxide emissions can increase local ozone and particulate matter, with resulting air quality, health, and environmental impacts.

**B.      GHG POLLUTION, CLIMATE CHANGE, AND OIL AND GAS**

63.     Oil and gas production, processing, transmission, and distribution activities impact the environment through direct, indirect, and cumulative impacts. These impacts:

    **a.**      Include the impacts caused by construction of oil and gas infrastructure, including access roads, well pads, wells, compressor stations, utility lines, pipelines, and other infrastructure, to the environment and the environment's ability to respond to mitigation and to maintain resiliency in the face of climate change;

    **b.**      The impacts caused by the persistent, physical footprint of oil and gas infrastructure to the environment and the environment's ability to respond to mitigation and to maintain resiliency in the face of climate change;

    **c.**      The impacts caused by the operation, maintenance, and use of oil and gas infrastructure operations, as well as the use of that infrastructure over time, to the environment and the environment's ability to respond to mitigation and to maintain resiliency in the face of climate change;

    **d.**      The impacts caused by the construction, persistence, and use of oil and gas infrastructure, when combined with the impacts caused by GHG pollution and climate change, to the environment and the environment's ability to respond effectively to mitigation and to maintain resiliency in the face of climate change;

**64.**    Oil and gas production, processing, transmission, and distribution activities emit GHG pollution, in particular methane, into the atmosphere, contributing to the alteration and deterioration of our climate and consequent impacts to the environment and precluding the sale of otherwise marketable energy resources to consumers. For example:

    **a.**      Methane is emitted when a well is drilled or the operator completes a well workover;

b.     Methane is emitted in the process of dehydrating natural gas, a process used to improve gas quality, minimize corrosion in the gas sales line, and mitigate gas hydrate formation;

c.     Methane is emitted from leaks in seals and rod packing mechanisms in both centrifugal and reciprocating compressors;

d.     Pneumatic devices, which regulate pressure, gas flow, liquid levels, and operate valves, release methane to the atmosphere over the course of normal operations;

e.     Pipeline maintenance and repair can result in methane venting to the atmosphere when the pipeline is cut or to reduce the potential fire or explosion risk while working on the pipe;

f.     Crude oil and condensate tanks emit methane through flashing losses, working losses, and standing losses;

g.     Methane leaks from an oil and gas facility valves, drains, pumps, threaded and flanged connections, pressure relief devices, open-ended valves and lines, sample points, and as gas moves through equipment at high pressure. These fugitive emissions are caused by equipment wear and tear, improper or incomplete assembly of equipment components, inadequate material specifications, manufacturing defects, equipment damaged through installation or use, corrosion, or fouling.

65.     Methane is a colorless, odorless gas and methane leaks often go unnoticed.

66.     EPA, on its website for the Natural Gas STAR program, and on the basis of 2006 analysis, states that "[o]il and natural gas operations are a significant source of global methane

emissions and account for approximately 18 percent of the total human-made sources [of methane]." Domestically, EPA found, on the basis of its 2010 U.S. GHG Inventory, that "oil and gas systems are one of the largest human-made sources of methane emissions and account for 22 percent of methane emissions in the United States or 1.8 percent of the total greenhouse gas emissions in the United States."

67.    However, EPA, in a Technical Support Document prepared for its GHG reporting rule for the oil and gas sector, found that emissions estimates used for its prior analyses of GHG emissions, including the 2010 U.S. GHG Inventory referenced in ¶ 66 "do not correctly reflect the operational practices of today" and that "that emissions from some sources may be much higher than currently reported in the U.S. GHG Inventory."

68.    EPA, in its Technical Support Document, identified six GHG emissions sources from oil and gas operations "significantly underestimated in the [2010] U.S. GHG Inventory":

      **a.**    well venting for liquids unloading;

      **b.**    gas well venting during well completions;

      **c.**    gas well venting during well workovers;

      **d.**    crude oil and condensate storage tanks;

      **e.**    centrifugal compressor wet seal degassing venting; and:

      **f.**    flaring.

69.    EPA, in its Technical Support Document, provided revised emissions factors for the GHG emissions sources identified in ¶ 68. These revised emissions factors range from 11 times higher (for well venting from liquids unloading) and 36 times higher (for gas well venting from conventional well completions) to as much as 3,540 and 8,800 times higher (for gas well venting during well workovers and completions of unconventional wells, respectively).

70.     EPA, based on the revised emissions factor provided by EPA's Technical Support Document, more than doubled the estimated GHG emissions from the sources identified in ¶ 68, from 90.2 to 198.0 million metric tons of carbon dioxide equivalent ("MMTCO2e"), relative to EPA's 2008 GHG Inventory. In total, EPA ultimately revised its GHG emissions estimates for oil and gas production, processing, transmission, storage, and distribution upwards from 201.8 MMTCO2e to 317 MMTCO2e. Of this revised amount, methane totaled 288.74 MMTCO2e.

71.     EPA's revised GHG emissions estimates for the oil and gas sector are, using EPA's GHG calculator, www.epa.gov/cleanenergy/energy-resources/calculator.html, equivalent to the annual CO2e emissions from 82.3 coal-fired power plants or, looked at differently, the annual CO2e emissions from 60.6 million passenger vehicles.

72.     EPA, in its Technical Support Document, specifically provided a revised emissions factor for unconventional well completions and workovers, an area of particular uncertainty regarding methane emissions. As EPA noted in a related Federal Register notice, the emissions factor used for well completions and workovers in the U.S. GHG Inventory "was developed prior to the boom in unconventional well drilling (1992) and in the absence of any field data and does not capture the diversity of well completion and workover operations or the variance in emissions that can be expected from different hydrocarbon reservoirs in the country." 75 Fed. Reg. 18608, 18621 (April 12, 2010).

73.     EPA, in its Technical Support Document, revised its emissions factor dramatically upwards from 3 thousand standard cubic feet (3 Mcf) to 9,175 thousand standard cubic feet (9,175 Mcf) – an emissions factor 3,058 times greater than EPA had used in its U.S. GHG inventories, including the most recent 2010 U.S. GHG Inventory.

74.     Using this revised emissions factor, as well as other revised emissions factors for

well completions and workovers, EPA determined that GHG emissions from well completions and workovers totaled 120 billion standard cubic feet of methane – a vastly larger figure than the 0.1 Bcf/yr estimated by the 2010 U.S. GHG Inventory and, indeed, a larger figure for this single source than the 103 Bcf/yr the 2010 U.S. GHG Inventory reports for the entire oil and gas production sector.

75.    The U.S. GHG Inventory published in 2010 states that "[n]atural gas well venting due to unconventional well completions and workovers, as well as conventional gas well blowdowns to unload liquids have already been identified as sources for which Natural Gas STAR reported reductions are significantly larger than the estimated inventory emissions."

76.    Uncertainties in oil and gas GHG emissions estimates are based on leasehold-specific geologic characteristics and verified industry data for methane recovered through GHG reduction technologies and practices, with the recovered gas representing gas that would have otherwise been emitted to the atmosphere. For example:

    a.    A BP project employing green completion technology at 106 wells reported 3,300 Mcf of gas recovered per well;

    b.    A Devon Barnett Shale project employing green completions at 1,798 wells reported 6,300 Mcf of gas recovered per well; and:

    c.    A Williams project in the Piceance Basin employing green completions at 1,064 wells reported 23,000 Mcf of gas recovered per well.

77.    Uncertainties in oil and gas GHG emissions estimates are caused by the dispersed nature of oil and gas operations; rather than a single, easily discerned source, such as a coal-fired power plant, oil and gas operations consist of large numbers of wells, tanks, compressor stations, pipelines, and other equipment that, individually, may appear insignificant but, cumulatively,

may very well be quite significant. While dispersed, oil & gas development is a massive, landscape-scale industrial operation – one that just does not happen to have a single roof.

78.     As explained in the Final New Mexico GHG Inventory and Reference Case Projections, 1990-2020, and relevant to Montana:

> The sheer number and wide diversity of oil and gas activities in New Mexico present a major challenge for greenhouse gas assessment. Emissions of carbon dioxide and methane occur at many stages of the production process (drilling, production, and processing/refining), and can be highly dependent upon local resource characteristics (pressure, depth, water content, etc.), technologies applied, and practices employed (such as well venting to unload liquids which may result in the release of billions of cubic feet of methane annually). With over 40,000 oil and gas wells in the State, three oil refineries, several gas processing plants, and tens of thousands of miles of gas pipelines in the State – and no regulatory requirements to track $CO_2$ or $CH_4$ emissions – there are significant uncertainties with respect to the State's GHG emissions from this sector.

79.     New Mexico's GHG Inventory repeatedly emphasizes that its emissions calculations may be low and that further review of oil and gas GHG emissions is necessary.

80.     GHG emissions from oil and gas leasing and development illuminate inefficiencies and waste in the production of oil and gas resources.

81.     A cubic foot of methane emitted to the atmosphere is a cubic foot of methane that a lessee cannot sell to market, a cubic foot of methane that government cannot collect royalties on, and a cubic foot of methane that is unavailable for purchase and use by consumers.

82.     The development of these oil and gas leases will result in the emission of GHG pollution during production, processing, transmission, and distribution activities. If this pollution is prevented or abated, it would help safeguard the climate, produce more energy for consumers, reduce the pressure to lease and develop other resources, increase federal and state royalties from oil and gas production, improve the efficiency of oil and gas production operations, and thereby likely increase the profitability of oil and gas lease development. If not prevented or abated, this

pollution will contribute to climate change, reflect waste and inefficiencies that reduce the supply of energy to consumers, increase the pressure to lease and develop other resources, reduce royalties that federal and state governments would be able to assess from more efficient operations, and lower profits that a specific lease would otherwise produce.

83.     Given the existing atmospheric GHG concentration in the atmosphere (at least 385 parts per million of carbon dioxide equivalent ("CO2e")), science-based estimates of the requisite maximum concentration necessary to provide a measure of climatic stability (350 parts per million CO2e), and the potential for tipping points as the concentration increases, incremental GHGs emissions throughout the lifecycle of oil and gas production, processing, transmission, and distribution process may induce cumulatively significant impacts to the environment.

84.     GHG emissions, in particular methane, from oil and gas development can be prevented or abated with proven, cost-effective measures including, for example:

a.     Used Reduced Emission Completion, or "Green Completion, technologies for well drilling or repair. These technologies capture methane gas and gas liquids that would otherwise be vented or flared to the atmosphere for sale;

b.     Installing plunger lift systems in gas wells. These systems route methane gas that would otherwise be vented to the atmosphere to a gas sales line;

c.     Replacing glycol dehydrators with desiccant dehydrators, utilizing flash tank separators at glycol dehydrators, optimizing glycol circulation rate, or utilizing other zero emission dehydrator technologies;

d.     Replacing "wet" seals in centrifugal compressors with "dry" seals, thus preventing the escape of methane that would otherwise be released

through absorption into the seal oil and through to the atmosphere, methane that can then be sold;

e.  Replacing worn-out rod packing in reciprocating compressors, thus preventing or abating methane leaks from worn piston rods, incorrect amounts of lubrication, dirt or foreign matter in packing, and packing material out of tolerance, and ensuring that methane can then be sold;

f.  Retrofitting or replacing high-bleed pneumatic controllers with low-bleed or no-bleed pneumatics;

g.  Mitigating methane venting during the repair or replacement of pipelines, ensuring that methane otherwise released to the atmosphere when a pipe is, for example, cut, is captured and then sold;

h.  Installing vapor recovery units on crude oil, condensate, or other tanks storing liquid petroleum products; and

i.  Conducting directed inspection and maintenance at wellheads, compressor stations, and processing plants to reduce fugitive leaks from valves, flanges, and other connectors.

85.  While proven, off-the-shelf methane reduction technologies and practices exist, they may not be installed for a variety of reasons including outdated agency policies, a lack of awareness by oil and gas operators, institutional inertia by oil and gas operators, or a focus on other industry activities that are deemed more important than GHG reductions.

86.  The methane reduction technologies and practices identified in ¶ 84 are illustrative, not exhaustive; EPA's Natural Gas STAR program has identified over 150 proven, cost-effective technologies and practices. EPA's Natural Gas STAR program "encourages oil

and natural gas companies – both domestically and abroad – to adopt cost-effective technologies and practices that improve operational efficiency and reduce emissions of methane, a potent greenhouse gas and clean energy source."

87.     EPA's Natural Gas STAR program reported on its website that its partners achieved GHG emission reductions totaling 904 billion cubic feet since 1993.

88.     In 2008, EPA reporting that its Natural Gas STAR program had eliminated 114 Bcf of domestic methane emissions. These reductions were "equivalent to":

    a.     The additional revenue of nearly $802 million in natural gas sales.

    b.     The avoidance of 46.3 million tons of $CO_2$ equivalent.

    c.     The $CO_2$ emissions from the electricity use of nearly 6 million homes per year.

    d.     The annual greenhouse gas emissions from approximately 8.5 million passenger vehicles.

    e.     The carbon sequestered annually by 10.5 million acres of pine or fir forests.

89.     The majority (78%) of the reductions noted in ¶ 87 were achieved in the oil and gas production sector.

90.     The State of Montana's November 2007 Climate Change Action Plan recommends that the oil and gas production sector reduce emissions by: (a) using new efficient compressors; (b) optimizing gas flow to improve compressor efficiency; (c) improving performance of compressor cylinder ends; (d) capturing compressor waste heat; (e) replacing compressor driver engines; and (f) using waste heat recovery boilers.

91.     Companies producing oil and gas in Montana have reported success in utilizing a

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**Page 24 of 40**

number of methane reduction measures.

92.     The Government Accountability Office stated in testimony provided to Congress on September 19, 2009, that BLM is "not meeting its statutory obligations or agency targets for inspecting certain leases and metering equipment," and has not consistently completed "required environmental inspections – the primary mechanism to ensure that companies are complying with various environmental laws and lease stipulations."

93.     The Government Accountability Office stated in testimony provided to Congress on July 22, 2010 that:

> Oil and gas activity has generally increased over the past 20 years, and our reviews have found that Interior has – at times – been unable to adequately oversee these activities: (1) completing environmental inspections; (2) verifying oil and gas production; (3) hiring, training, and retaining staff; (4) using categorical exclusions to streamline environmental analyses required for certain oil and gas activities; (5) performing environmental monitoring in accordance with land use plans; (6) conducting environmental analyses; and (7) responding to onshore lease protests.

94.     On November 29, 2010, the Government Accountability Office released a report entitled *Federal Oil and Gas Leases: Opportunities Exist to Capture Vented and Flared Natural Gas, Which Would Increase Royalties and Reduce Greenhouse Gas Emissions* (GAO 11-34). The report found, *inter alia*, that:

    a.     The Department of the Interior has underestimated natural gas – i.e., methane – vented or flared from oil & gas production;

    b.     BLM's understanding and implementation of venting and flaring guidance was plagued with inconsistencies and, generally, contributed to underestimates of methane emissions;

    b.     One-hundred and twenty-six billion cubic feet of methane was released to the atmosphere in 2008, an amount roughly equivalent to the natural gas

needed to heat about 1.7 million homes during a year;

    **c.**    Approximately 40% of natural gas vented or flared from onshore oil & gas production could be economically captured with currently available control technologies, increasing federal royalty payments by $23 million annually and reducing GHG emissions by an amount equivalent to 16.5 MMTCO2e, the annual emissions equivalent to 3.1 million cars.

    **d.**    There were barriers to GHG reduction measures;

    **e.**    The oil & gas industry is a "major source of volatile organic compounds," an air quality problem;

    **f.**    Existing oversight efforts to limit venting and flaring have "severe limitations"; and

    **g.**    "BLM guidance is 30 years old and therefore does not address venting and flaring reduction technologies that have advanced since it was issued."

### C.    BLM MANAGEMENT OF OIL AND GAS

**95.**    BLM manages onshore oil and gas development through a three-phase process.

**96.**    Each phase is distinct, each phase serves distinct purposes, and each phase is subject to distinct rules, policies, and procedures.

**97.**    In the first phase, BLM prepares a Resource Management Plan ("RMP"). RMPs are prepared in accordance with 43 C.F.R. Part 1600. RMPs project present and future use of public lands and their resources by establishing management priorities and guiding and constraining BLM's implementation-stage management.

**98.**    Relative to oil and gas development, at the RMP phase, BLM determines what areas are available for leasing but does not identify specific leaseholds for sale.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**Page 26 of 40**

99.     In the second phase, BLM identifies the boundaries for lands to be offered for sale and proceeds to sell and execute leases for those lands through a lease sale.

100.     Oil and gas companies typically nominate leaseholds for sale through the submission of an "Expression of Interest."

101.     Leases are sold in accordance with 43 C.F.R. Part 3120.

102.     Prior to the point BLM sells a lease, BLM may refuse to lease public lands, even if public lands were made available for leasing pursuant to the RMP.

103.     Prior to the point BLM sells a lease, BLM's authority to subject leases to terms and conditions – i.e., 'stipulations' to protect the environment – is at an apex; once leases are sold, BLM may not retroactively impose stipulations on a lease. Instead, BLM may only impose conditions of approval that are delimited by the terms and conditions of the lease. A "stipulation" is therefore legally and functionally different than a "condition of approval," as those terms are used by BLM.

104.     Oil and gas operations are conducted in accordance with 43 C.F.R. Part 3160.

105.     Once a lease is issued, the lessee must submit an application for permit to drill ("APD") to BLM prior to drilling. The APD is prepared by the lessee to realize the lessee's investment-backed expectations, expectations that are derivative of the terms and conditions of the oil and gas lease.

106.     While BLM manages oil and gas resources through a three-phased process, there are important steps that take place between the execution of a lease and the lessee's submission of an APD to BLM for approval. For example, prior to submitting an APD, BLM requires the lessee or the lessee's operator to obtain all necessary right-of-way permits. In addition, leases inform well-spacing programs and unitization, communitization, and other types of drilling unit

agreements entered into by lessees after a lease is sold and executed but prior to the development and submission of APDs. These activities define and delimit APDs and BLM's review and approval of those APDs.

### D.   BLM'S OIL AND GAS LEASING PROCESS AND DECISIONS

107.   According to BLM's website, "[t]raditional oil and gas activity is scattered across the [Montana and the Dakotas] with significant fields in two areas: the Williston Basin in western North Dakota and eastern Montana and the general vicinity of Great Falls in west-central Montana. Natural gas also occurs in significant quantities in coal seams, particularly those in the Powder River Basin."

108.   In 2008, BLM held four competitive oil and gas lease sales dated April 8, 2008, June 17, 2008, August 26, 2008, and November 4, 2008. BLM's decisions regarding the leases executed as a result of these lease sales were subsequently challenged in *Mont. Envtl. Info. Ctr. v. BLM*, 08-CV-178 DWM. BLM suspended the active leases executed through these lease sales pending further environmental review as a result of the court-approved March 11, 2010 settlement agreement reached in *Mont. Envtl. Info. Ctr. v. BLM*, 08-CV-178 DWM.

109.   In the wake of the March 2010 settlement agreement reached in *Mont. Envtl. Info. Ctr. v. BLM*, 08-CV-178 DWM, BLM deferred the sale of additional leases pending completion of the environmental review process triggered by the settlement agreement.

110.   The environmental review process triggered by the settlement agreement was designed to review BLM decisions concerning oil and gas leases that were issued in 2008, and subsequently suspended in March 2010, as well as to review parcels nominated for subsequent lease sales, including a lease sale that was held on December 9, 2010.

111.   BLM's environmental review process consisted of eight separate environmental

assessments ("EAs") prepared for the Billings, Butte, Dillon, Lewiston, Malta, Miles City, North Dakota, and South Dakota Field Offices.

112.    Every leasing EA only considers two NEPA alternatives, a no action alternative and a preferred alternative.

113.    To inform the environmental review process, BLM also contracted with URS Corporation for the preparation of a Climate Change Supplemental Information Report ("SIR").

114.    The SIR is not an environmental assessment or environmental impact statement as defined by NEPA or its implementing regulations.

115.    Neither the leasing EAs nor the SIR identify or consider any alternatives, as defined by NEPA, pertaining to GHG pollution or climate change.

116.    Neither the leasing EAs nor the SIR identify, consider, or reject any alternatives that would impose stipulations to prevent or abate GHG pollution and climate change on the leases suspended pursuant to the March 2010 settlement agreement or the leases offered, sold, and executed through the December 9, 2010 oil and gas lease sale.

117.    Alternatives to prevent or abate methane pollution from oil and gas production are practical, feasible, available, and realistic.

118.    Alternatives to prevent or abate GHG pollution from oil and gas production are within the purpose and need of BLM's environmental review.

119.    Alternatives to prevent or abate GHG pollution from oil and gas production through stipulations attached to the oil and gas leases BLM offered for sale are practical, feasible, available, and realistic and within the purpose and need defined for BLM's environmental review.

120.    BLM does not contend, in its leasing EAs or decision documents, that alternatives

to prevent or abate GHG pollution from oil and gas production, through stipulations or otherwise, are inconsistent with the purpose and need defined for BLM's environmental review.

121.     The leasing EAs and SIR provide a generalized list of anticipated climate change impacts but evaluate how those impacts affect specific resources. Nor do the leasing EAs or SIR evaluate the aggregate, cumulative impact of oil and gas development and climate change to the environment, the effectiveness of existing environmental mitigation measures, or the resiliency of the environment to withstand further stress, in particular the stress caused by a deteriorating climate. Instead, the leasing EAs claim that "[i]t is … beyond the scope of existing science to relate a specific source of greenhouse gas emission or sequestration with the creation or mitigation of any specific climate-related environmental effects."

122.     Neither the leasing EAs nor the SIR acknowledge or evaluate GHGs, in particular methane, as a source of waste and inefficiencies in the production of oil and gas and, further, do not evaluate the significance of such waste and inefficiencies relative to context and intensity.

123.     Neither the leasing EAs nor the SIR account for uncertainties, controversy, and underestimates of GHG emissions from oil and gas development identified by, for example, EPA and New Mexico.

124.     Neither the leasing EAs nor the SIR account for the near-term warming potential of GHG pollution, in particular the near term warming potential of methane over the lifetime of oil and gas production foreseen on the challenged leases. Instead, the Leasing EAs rely exclusively on a 100-year warming period for GHGs.

125.     Neither the leasing EAs nor the SIR evaluate the role that BLM's limited staff, resources, and capability to oversee oil and gas exploration and production operations plays in terms of the impacts of development and BLM's ability to protect the environment and to ensure

that waste and inefficiencies are prevented or avoided.

126.    The leasing EAs and SIR provide a false sense of certainty and underestimate oil and gas development's total and cumulative GHG emissions, as well as the impacts caused by these emissions by failing to account for uncertainties, controversy, and underestimates of GHG emissions, including the near-term warming potential of GHGs, in particular methane.

127.    The Climate Hawks submitted comments to BLM regarding its Leasing EAs and the SIR dated June 10, 2010 and September 13, 2010, emphasizing and providing recommendations regarding myriad climate change and methane waste concerns implicated by BLM's proposed actions.

128.    BLM spokeswoman Mary Apple, in an August 13, 2010 Associated Press article published in The Missoulian, stated that, "We can't show a direct tie between these emissions and climate change, so we can't attach (restrictions on development) to leases." Similarly, an August 19, 2010 article Land Letter article noted that "'[w]e can't tie the emissions to climate change,' said BLM spokeswoman Mary Apple. 'So we can't set stipulations for something that we don't know.'"

129.    The Climate Hawks protested BLM's December 9, 2010 lease sale in a protest dated November 23, 2010, emphasizing and providing recommendations regarding myriad climate change and methane waste concerns implicated by BLM's proposed actions.

130.    BLM proceeded with the December 9, 2010 lease sale before resolving the Climate Hawks' protest.

131.    BLM rejected the Climate Hawks' protest on December 27, 2010.

132.    BLM signed Findings of No Significant Impact and Decision Records on December 27, 2010, thus confirming BLM's decision to offer lease parcels for sale through the

December 9, 2010 lease sale and lifting, in part, the suspension on the oil and gas leases suspended pursuant to the March 2010 settlement agreement.

133.    BLM withheld any finding regarding the significance of GHG emissions or climate change, asserting that "the current state of [climate change] science does not allow determinations to be made about the specific effects of specific actions" but that "given the state of the science, preparation of an environmental impact statement is not warranted, as it would not further inform my decision, or the public, with respect to the significance or lack thereof, of this proposed action as to the issue of GCC or GHG."

134.    BLM made no finding regarding the significance of methane waste or inefficiencies from oil and gas activities.

135.    BLM's Leasing EAs, relative to GHG pollution and climate change impacts, cannot tier to or conform to applicable Resource Management Plans ("RMPs) and RMP-stage NEPA analyses because these RMP-stage decisions and analyses do not address, or, at the least, do not meaningfully address, GHG pollution and climate change as there are no GHG pollution or climate change decisions and analyses to tier or conform to.

136.    BLM's December 27, 2010 decision lifted the suspension on 45 Montana oil and gas leases, maintained suspension on six leases, and partly lifted the suspension on two leases. The remaining 8 leases suspended as a result of the March 2010 settlement agreement have terminated. As a result, 25,329 acres of are not longer in suspension, while 6,667 acres will remain in suspension.

137.    The areas remaining in suspension primarily involve sage grouse and Yellowstone cutthroat trout issues that will be analyzed in resource management plans.

138.    As a result of the December 9, 2010 lease sale, BLM executed 53 oil and gas

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**Page 32 of 40**

leases in Montana totaling just over 33,257 acres. The 66 leases offered for sale by BLM in Montana that did not receive bids at the December 9, 2010 lease sale remain available for noncompetitive sale.

139.    Eliminating the methane emissions anticipated by BLM's leasing decisions in Montana and the Dakotas would, using BLM figures, produce the following potential benefits each and every year the leases are developed:

      **a.**   Additional natural gas sales of $9,000,000 each year;

      **b.**   Eliminating emissions equivalent to the CO2 emissions from electricity used by 94,737 homes for one year; or

      **c.**   Eliminating emissions equivalent to the GHG emissions caused by use of 134,211 passenger vehicles annually.

140.    The calculations in ¶ 139 underestimate the true significance of the potential benefits of eliminating methane emissions – and the underlying adverse impact that would be caused by not eliminating these emissions – as EPA has more than doubled the estimated emissions from oil and gas production, an action that BLM did not account for in its decision-making process whether at a broad or Montana-specific scale.

141.    Secretarial Order 3226 requires BLM to consider and analyze climate change before selling and executing oil and gas leases.

142.    Section 3 of Secretarial Order 3226 requires that:

Each bureau and office of the Department [of the Interior] will consider and analyze potential climate change impacts when undertaking long-range planning exercises, when setting priorities for scientific research and investigations, when developing multi-year management plans, and/or when making major decisions regarding the potential utilization of resources under the Department's purview.

143.    Section 3 of Secretarial Order 3226 provides that:

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**Page 33 of 40**

Departmental activities covered by this Order include, but are not limited to, programmatic and long-term environmental reviews undertaken by the Department, management plans and activities developed for public lands, planning and management activities associated with oil, gas and mineral development on public lands, and planning and management activities for water projects and water resources.

144.    Secretarial Order 3226 is self-executing.

145.    BLM has duties, pursuant to the Mineral Leasing Act, as amended by the Federal Onshore Oil and Gas Leasing Reform Act, and the Federal Land Policy and Management Act, and pursuant to BLM regulations and policies promulgated pursuant to these laws, to prevent waste and to prevent unnecessary or undue degradation to lands and resources. These duties inform BLM's NEPA responsibilities and the adequacy of the NEPA environmental reviews used to justify its decisions.

146.    The Climate Hawks have been required to expend costs and to obtain the services of a law firm, including attorneys, law clerks, and legal assistants to prosecute this action. The Climate Hawks are entitled to costs of disbursements and costs of litigation, including reasonable attorney and expert witness fees, as provided for under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d).


V.    **CLAIMS FOR RELIEF**

   A.    **BLM FAILED TO CONSIDER REASONABLE ALTERNATIVES TO PREVENT OR ABATE GREENHOUSE GAS POLLUTION AND WASTE**
         **(Violation of NEPA)**

147.    The Climate Hawks hereby restate and incorporate by this reference all preceding paragraphs.

148.    NEPA is our "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1.

**149.**     NEPA explains, in 40 C.F.R. §1500.1(c), that:

Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork – even excellent paperwork – but to foster excellent action. The NEPA proposes is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.

**150.**     BLM must comply with NEPA before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v); *see also* 40 C.F.R. §§ 1501.2, 1502.5(a).

**151.**     BLM, pursuant to NEPA, must consider "alternatives to the proposed action" and "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. §§ 4332(2)(C)(iii), 4332(E).

**152.**     In considering alternatives, BLM must "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action including a "no action" alternative. 40 C.F.R. § 1502.14(a), (d).

**153.**     Alternatives must be presented in a "comparative form" in order to "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decision maker and the public." 40 C.F.R. § 1502.14.

**154.**     BLM "shall not commit resources prejudicing selection of alternatives before making a final decision (Sec. 1506.1)" and must prepare NEPA analyses such that they "serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made." 40 C.F.R. §§ 1502.2(f), (g); 40 C.F.R. § 1506.1.

**155.**     BLM violated NEPA and NEPA's implementing regulations because BLM failed to consider reasonable alternatives to prevent or abate GHG pollution emitted by the production

of oil and gas.

156.    BLM violated NEPA and NEPA's implementing regulations because BLM failed to consider reasonable alternatives to prevent or abate methane waste and inefficiencies in the production of oil and gas.

157.    BLM cannot rely on the speculative promise of mitigation to avoid the agency's duty to consider alternatives.

158.    BLM's actions are arbitrary, capricious, an abuse of discretion, in excess of statutory authority and limitations, short of statutory right, and not in accordance with the law and procedures required by law, because BLM failed to consider reasonable alternatives. 5 U.S.C. §§ 706(2)(A), (C), (D).

**B.     BLM FAILED TO PREPARE ENVIRONMENTAL IMPACT STATEMENTS AND FAILED TO PROVIDE A CONVINCING STATEMENT OF REASONS JUSTIFYING ITS DECISION TO FORGO ENVIRONMENTAL IMPACT STATEMENTS**
**(Violation of NEPA)**

159.    The Climate Hawks hereby restate and incorporate by this reference all preceding paragraphs.

160.    NEPA obligates federal agencies to prepare an EIS for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

161.    An agency may first prepare an Environmental Assessment ("EA"): (1) to provide evidence and analysis that establish whether or not an EIS or a Finding of No Significant Impact ("FONSI") should be prepared; (2) to help it comply with NEPA when no EIS is necessary; and (3) to facilitate preparation of an EIS when one is necessary. 40 C.F.R. § 1508.9.

162.    If there are substantial questions whether a proposed action may significantly impact the environment, an EIS must be prepared.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**Page 36 of 40**

163.    Whether or not a proposed action "significantly" impacts the environment is determined by considering "context and intensity." 40 C.F.R. § 1508.27.

164.    BLM's decisions to lift the suspension of the oil and gas leases suspended pursuant to the March 2010 settlement are major federal actions.

165.    BLM's decisions to hold the December 9, 2010 oil and gas lease sale, decision to reject the Climate Hawks' protest of that lease sale, and decisions to execute the leases sold through the December 9, 2010 oil and gas lease sale, are major federal actions.

166.    BLM has failed to address serious issues and relevant factors pertinent to those issues regarding the context and intensity of its decisions.

167.    There are substantial questions that BLM's decisions may significantly impact the environment.

168.    BLM has failed to provide convincing statements of reasons justifying its decisions to forgo Environmental Impact Statements.

169.    That BLM may require GHG reduction measures at the drilling stage does not eliminate substantial questions that BLM's decisions may significantly impact the environment and, further, does not justify BLM's decisions to forgo Environmental Impact Statements.

170.    BLM's actions are arbitrary, capricious, an abuse of discretion, in excess of statutory authority and limitations, short of statutory right, and not in accordance with the law and procedures required by law, because BLM failed to prepare Environmental Impact Statements and failed to provide a convincing statement of reasons justifying its decisions to forgo preparation of Environmental Impact Statements. 5 U.S.C. §§ 706(2)(A), (C), (D).

### C.    BLM FAILED TO TAKE A HARD LOOK AT DIRECT, INDIRECT, AND CUMULATIVE IMPACTS TO THE ENVIRONMENT
### (Violation of NEPA)

171.    The Climate Hawks hereby restate and incorporate by this reference all preceding paragraphs.

172.    BLM, pursuant to NEPA and NEPA's implementing regulations, must take a hard look at the direct, indirect, and cumulative environmental consequences of a proposed action and its alternatives to the human environment; disclose unavoidable adverse impacts; address the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and identify irreversible and irretrievable commitments of resources. *See* 42 U.S.C. §§ 4332(2)(C)(i)-(v); 40 C.F.R. §§ 1502.14(a), 1502.16, 1508.7, 1508.8, and 1508.14.

173.    BLM's duty to take hard look at direct, indirect, and cumulative impacts is intended to ensure that BLM and the public can compare, contrast, and ultimately make a reasoned and informed choice amongst alternatives. 40 C.F.R. §§ 1502.14, 1502.15.

174.    Direct and indirect impacts relevant here include the GHG pollution from oil and gas operations to the atmosphere; the indirect, secondary GHG pollution and impacts triggered by oil and gas exploration, production, and processing, transportation and distribution, and refining; and the cumulative impacts of GHG pollution and development to the atmosphere and the communities and landscapes of Montana and the American West from oil and gas activities when combined with such activities on other private and public leaseholds as well as other GHG emission sources, such as coal mines and coal-fired power plants.

175.    Cumulative impacts included the combined impact of oil and gas development and climate change on the environment.

176.    Direct, indirect, and cumulative impacts include the inefficient production and waste of public oil and gas resources and the consequences of such inefficient production and

waste to: demand for additional oil and gas and other energy leases and development; and the environment.

177.    BLM failed to take a hard look at the direct, indirect, and cumulative impacts of oil and gas development, GHG pollution, and climate change to the environment caused by the challenged decisions.

178.    BLM failed to take a hard look at the inefficient production and waste of oil and gas and the consequences of such inefficient production and waste to the mineral resource and the environment caused by the challenged decisions.

179.    BLM's actions are arbitrary, capricious, an abuse of discretion, in excess of statutory authority and limitations, short of statutory right, and not in accordance with the law and procedures required by law, because BLM failed to take a hard look at direct, indirect, and cumulative impacts of its decisions to the environment. 5 U.S.C. §§ 706(2)(A), (C), (D).


## VII.    RELIEF REQUESTED

WHEREFORE, the Climate Hawks respectfully request that this Court:

A.    Declare that BLM's actions violate NEPA, and regulations and policies promulgated thereunder;

B.    Set aside BLM's actions;

C.    Void or, alternatively, suspend and enjoin the oil and gas leases and further lease sales by BLM in Montana pending full compliance with NEPA, and NEPA's regulations and policies;

D.    Issue such relief as the Climate Hawks subsequently request or that this Court may deem just, proper, and equitable.

E.    Retain continuing jurisdiction of this matter until BLM fully remedies the violations

of law complained of herein.

      **F**.    Award the Climate Hawks their fees, costs, and other expenses as provided by applicable law.

Respectfully submitted this 7th Day of February, 2011,

/s/ Sarah McMillan
Sarah McMillan (MT Bar # 3634)
WESTERN ENVIRONMENTAL LAW CENTER
P.O. Box 7435
Missoula, Montana 59807
(p) 406.728.5096
(f) 406.443.6305
mcmillan@westernlaw.org

Erik Schlenker-Goodrich (NM Bar #17875)
*admission pro hac vice pending*
WESTERN ENVIRONMENTAL LAW CENTER
208 Paseo del Pueblo Sur #602
Taos, New Mexico 87571
(p) 575.613.4197
(f) 575.751.1775
eriksg@westernlaw.org

**COUNSEL FOR THE CLIMATE HAWKS:**

**Montana Environmental Information Center,
Earthworks' Oil & Gas Accountability Project, and
Wild Earth Guardians**