William W. Mercer
Holland & Hart llp
401 North 31st Street
Suite 1500
P. O. Box 639
Billings, Montana 59103-0639
E-mail: wwmercer@hollandhart.com
Telephone: (406) 896-4607
Fax: (406) 252-1669

Attorney for Defendant-Intervenors
American Petroleum Institute,
Montana Petroleum Association,
Montana Chamber of Commerce,
and Western Energy Alliance

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## GREAT FALLS DIVISION

| | |
|---|---|
| MONTANA ENVIRONMENTAL INFORMATION CENTER, EARTHWORKS' OIL AND GAS ACCOUNTABILITY PROJECT, and WILDEARTH GUARDIANS,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES BUREAU OF LAND MANAGEMENT, an agency within the U.S. Department of Interior, KENNETH L. SALAZAR, in his official capacity as Secretary of the Interior, JAMIE CONNELL, in her official capacity as State Director of the Bureau of Land Management's | Case No. CV 11-15-GF-SEH<br><br><br><br>DEFENDANT-INTERVENORS' BRIEF IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT |

| | |
|---|---|
| Montana State Office, and THERESA | ) |
| M. HANLEY, in her official capacity | ) |
| as Deputy State Director of the Bureau | ) |
| of Land Management's Montana State | ) |
| Office, | ) |
| | ) |
|      Federal Defendants. | ) |
| | ) |
|      v. | ) |
| | ) |
| American Petroleum Institute, | ) |
| Montana Petroleum Association, | ) |
| Montana Chamber of Commerce, | ) |
| and Western Energy Alliance, | ) |
| | ) |
|      Defendant-Intervenors. | ) |

In support of the cross-motion for summary judgment filed in conjunction

with this brief, Defendant-Intervenors assert that: (1) Plaintiffs cannot meet the

threshold required for Article III standing to bring this action and (2) the Federal

Defendants complied with their legal obligations in offering oil and gas leases on

land managed by the Bureau of Land Management ("BLM") and did not act in an

arbitrary or capricious manner. First, Plaintiffs' declarations do not establish an

injury to a protected interest caused by BLM's leasing decisions and susceptible to

relief through reversal of the final agency action. Further, BLM met its

responsibilities under the National Environmental Policy Act ("NEPA") by taking

a "hard look" at the environmental effects of the lease sales, which did not

necessitate the preparation of an Environmental Impact Statement ("EIS").

Plaintiffs are not entitled to the relief they seek.

## I.    Uncontroverted Facts in the Administrative Record

The history of this matter reaches back to 2008 when the same Plaintiffs

brought a similar case assigned to Judge Molloy, *MEIC v. BLM*, CV 08-178-M-

DWM. In that case, the government and Plaintiffs agreed to a remand to BLM for

further environmental review related to 61 oil and gas leases issued in 2008. On

August 12, 2010, after the district court remand, BLM prepared environmental

assessments ("EAs") for those leases. Complaint, ¶ 111. BLM also developed a

Climate Change Supplemental Information Report ("SIR"), which included GHG

emissions inventories and analysis of potential future oil and gas development. AR

1412-1581. On October 10, 2010, BLM issued a lease sale notice for oil and gas

leases and made available for review eight EAs and the Climate Change SIR.

In the current lawsuit, Plaintiffs seek to suspend or void the leases initially

issued in 2008 in addition to approximately fifty leases auctioned on December 9,

2010. The successful bidders on the challenged leases acquired lease rights to

pursue development of federal minerals managed by BLM in Montana. Although

the lease sales involved parcels in Montana, North Dakota, and South Dakota,

Plaintiffs' challenge is limited to Montana leases. Plaintiffs allege that BLM failed

"to carefully address climate and energy concerns before selling and executing . . .

3

oil and gas leases in Montana." Complaint, ¶ 2. If successful, Plaintiffs believe "BLM would be required to revisit the challenged leasing . . . . Such relief could also spark broader-scale reform that would amplify the benefits of this litigation." Complaint, ¶ 28. On the other hand, as noted in the EAs, BLM's decision is designed to help meet the energy needs of the people of the United States. AR 1122.

To reduce potential impacts through mitigation pursuant to 40 C.F.R. § 1502.16, BLM and its contractor identified mechanisms to reduce GHG emissions for consideration as conditions of approval ("COAs") if development occurs. AR 1179-80; AR 1553.

## II.    Argument

### A.    Plaintiffs Lack Standing

Before Plaintiffs can bring their claims in court, they must prove they have standing by demonstrating that: (1) they have "suffered an 'injury-in-fact'" to a legally protected interest that is both "concrete and particularized" and "actual or imminent," as opposed to "conjectural" or "hypothetical;" (2) there is a "causal connection between the injury and the conduct complained of," and it is "not the result of the independent action of some third party not before the court;" and (3) it is "likely" - - not merely "speculative" - - "that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Where, as here, an organization is suing on behalf of its members, it must show that its members meet these threshold standing requirements. *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010). Further, where the Plaintiffs are not the object of the challenged agency action or inaction, "standing is not precluded, but is ordinarily 'substantially more difficult' to establish." *Defenders of Wildlife*, 504 U.S. at 562.

Here, Plaintiffs fail to meet their burden to show specific facts setting forth an "injury-in-fact," that the alleged injury was caused by the issuance of oil and gas leases, or that it can be redressed by relief from the court.

<ol start="1">
<li><b>Plaintiffs Alleged Injury-in-Fact is Not Concrete or Particularized and is Merely Conjectural</b></li>
</ol>

Plaintiffs fail to prove specific facts that show an injury-in-fact that is "concrete and particularized" and "actual or imminent." First, while an individual's recreational or aesthetic interest in a particular affected place is sufficient to meet the first prong of the test, "generalized harm to . . . the environment will not alone support standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). Standing in environmental cases is based on whether [plaintiffs] have shown a particularized environmental interest of theirs that will suffer demonstrably increased risk, and whether [defendant's activity] . . . is substantially likely to cause the demonstrable increase in risk to their particularized interest." *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996).

Plaintiffs' proffer must allow the Court to conclude "it is reasonably probable that the challenged action will threaten their concrete interests." *Citizens For Better Forestry v. U.S. Dept. of Agric.*, 341 F.3d 961, 969-70 (9th Cir. 2003).

In this case, Plaintiffs assert NEPA claims based on BLM's alleged failure to adequately consider climate change impacts of oil and gas development on the leases at issue. In five standing declarations, Plaintiffs assert a variety of recreational, aesthetic, and economic uses of public lands and adjacent private lands throughout Montana and the Rocky Mountain West generally, including in areas near the challenged leases. MEIC Br. Exs. 1-2, 4-6. They claim that these interests will be affected, at some speculative and undetermined point in the future, by climate change.[1] However, the harm they assert is not particular to Plaintiffs, or to the areas of Montana in which they live, work, and recreate. Rather, it is generalized harm, "shared by humanity at large, and the redress that Petitioners seek - - to prevent an increase in global temperature - - is not focused any more on these petitioners than it is on the remainder of the world's population." *Ctr. for Biological Diversity v. U.S. Dept. of the Interior*, 563 F.3d 466, 469 (D.C. Cir.

---

[1] Plaintiffs' causes of action are all premised on theories that rely on the existence of climate change related injuries to the local Montana environment, not the effects of surface-disturbing activities associated with oil and gas development. Thus, any allegations of harm from surface activities cannot establish standing. *See Amigos Bravos v. U.S. Bureau of Land Mgmt.*, 2011 WL 3924489, *14-*15 (D.N.M. Aug. 3, 2011).

2009) (finding plaintiffs lacked standing to raise substantive claims relating to generalized allegations of effects of climate change); *Sierra Club v. U.S. Def. Energy Support Ctr.*, 2011 WL 3321296, *3-*4 (E.D. Va. July 29, 2011) (finding plaintiffs lacked standing to raise climate change-related NEPA claims in part because they failed to show a concrete injury to a particularized interest of the challenged military fuel purchase policy).

Thus, Plaintiffs merely show an abstract concern that could be asserted by anyone on the planet - - not a particularized harm. Such generalized allegations of harm are not sufficiently "concrete and particularized" to give Plaintiffs "such a personal stake in the outcome of the controversy as to warrant [their] invocation of federal-court jurisdiction." *Summers*, 555 U.S. at 493. Further, Plaintiffs provide no scientific basis for the contention that their alleged injuries are the result of climate change. The court's decision in *Amigos Bravos v. U.S. Bureau of Land Mgmt.*, 2011 WL 3924489 (D.N.M. Aug. 3, 2011), is instructive. In that case, Amigos Bravos challenged BLM's issuance of 92 oil and gas leases in New Mexico alleging BLM violated NEPA by failing to adequately consider climate change impacts before issuing the leases. Finding the plaintiffs had no standing, the court pointed to the fact that plaintiffs presented no scientific evidence or formal, recorded observations to support their theory that climate change had already or was leading to their alleged harms - - less water, decreased biodiversity,

siltier rivers, and more forest fires in New Mexico. *Id*. at *6. Though the court did

not doubt the plaintiffs had concerns about possible effects of climate change, at

the summary judgment stage of litigation, they had the burden to "come forward

with more than bare assertions of perceived climate changes." *Id*. Without factual

support or scientific observations, their anecdotal stories amounted to "pure

conjecture." *Id*.

Similarly, in this case, Plaintiffs spend a great deal of time in their

declarations detailing their generalized concerns about climate change and personal

perceptions of how climate change has already led to environmental harms (less

snow pack, warmer streams, increased wildfires, decreasing wildlife populations).[2]

---

[2] Only one declaration cites to scientific observations specific to the declarant's
property. Mr. Wade Sikorski claims that green ash trees that once thrived in a
draw on his family ranch are dying and no replacements are growing. MEIC,
Ex. 2, ¶ 12. A study of green ash tree stands in Montana, which included green ash
on the declarant's ranch, considered the best methods for restoring green ash
woodlands in eastern Montana. MEIC, Ex. 3. Setting aside the hearsay objections
to this study, it theorizes why green ash are in decline in Montana, including
disease, drought, late freezes, insects, and fire – – all conditions which can, and
have, occurred independent of climate change. MEIC, Ex. 3, at 565. But the most
often cited cause is livestock grazing on seedlings and saplings, which, under the
most expansive theory of climate change impacts, has nothing to do with climate
change. *Id*. The study finds that by applying a herbicide to kill competing
perennial grasses in green ash stands, seedlings can grow, but that grazing must be
kept out of the area to ensure the best chance of restoration. *Id*. at 569-70. Though
there are passing references to climate change, it was not a focus of the study, and
the researcher did not claim to be an expert or to make any conclusions about
whether climate change was a major cause of the existing conditions of tree

*See, e.g.*, MEIC, Ex. 1, ¶ 11 ("As global warming continues to negatively affect fish and wildlife habitat as well as water quality and quantity in Montana, it will also become increasingly difficult to find the quality of recreational opportunity I have enjoyed here for the past 44 years."). While Plaintiffs' concerns are undoubtedly sincere, they are not enough to demonstrate "something beyond a reasonable concern over future environmental harm." *Amigos Bravos*, 2011 WL 3924489, *6.

In fact, climate change experts all over the world recognize the inherent uncertainty in climate change modeling and, in particular, the inability to predict localized impacts. *See* AR 1178-79, 1200 (Miles City Field Office EA); *see also Ctr. for Biological Diversity v. Lubchenco*, 2009 WL 4545169, *7 (N.D. Cal. 2009) (unpublished) ("[I]t is hard to conceive of a less localized issue than global climate change."). Unlike traditional pollutants that may have a localized area of impacts, *i.e.*, sulfur dioxide and other criteria pollutants regulated under the Clean Air Act, GHG do not concentrate locally, but disperse globally. No climate change research can or has predicted localized effects of GHG emissions specific to Montana. AR 1179-80, 1200. Generalizations about possible effects are not sufficient to prove concrete and particularized harm.

---

(cont'd.)..
stands. *Id.* Thus, the study does not show that the alleged injury to Mr. Sikorski's green ash trees is climate change related, as Mr. Sikorski believes.

In addition to showing "concrete and particularized" harm with a geographic nexus to their interests, Plaintiffs must demonstrate the alleged harm is actual or imminent. "A threatened injury must be certainly impending to constitute injury in fact." *Ctr. for Biological Diversity*, 563 F.3d at 478. Here, Plaintiffs assert both existing effects of climate change and future effects. As explained above, Plaintiffs' statements that climate change is affecting their current interests is based solely on anecdote and lay opinion. By contrast, BLM actually studied the impacts of its decisionmaking through scientific analyses, and produced well-reasoned EAs and an SIR. Plaintiffs ask that the court not defer to BLM's scientific review based on the unscientific methods of a handful of laymen.

To prove the probability of future effects, some declarants also cite to BLM's Climate Change SIR as evidence of the likely effects of climate change in Montana. *See, e.g.*, MEIC, Ex. 4, ¶ 24. While the SIR discusses in general terms - - extrapolated from national and regional studies, and not based on any Montana-specific study - - the potential effects in Montana, the predicted climate change effects may occur between 40 and 90 years from now. AR 1475-78. These uncertain and far-into-the-future effects do not amount to the "certainly impending" injury required to establish standing. *Amigos Bravos*, 2011 WL 3924489, *7. Even if the standing requirement of imminence of the projected harm is less demanding in a NEPA challenge, the potential impacts in the middle

10

of this century are unlike the potential short-term impacts in *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001).

Neither does the fact that Plaintiffs allege a procedural harm give them standing. The Ninth Circuit has held that asserting a procedural injury alone cannot confer Article III standing. *Wilderness Soc'y*, 622 F.3d at 1258. "Deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right in vacuo—is insufficient to create Article III standing." *Summers*, 555 U.S. at 496. "[I]njury in fact is a hard floor of Article III jurisdiction." *Id*. Even if the Plaintiffs can prove procedural violations, they must demonstrate an underlying injury to a concrete and particularized interest that may be affected by the procedural violation. *See Sierra Club*, 2011 WL 3321296, *4 (holding plaintiffs failed to show an injury-in-fact on their climate change-related NEPA claims by failing to demonstrate an underlying particularized injury). There is no relaxed standard to prove injury-in-fact in procedural cases, as the underlying concrete interest must be proven in either case.

As a policy matter, the court in *Amigos Bravos* stated, "With climate change, the Court must enforce some limits on what constitutes an injury-in-fact; otherwise, it would be overwhelmed by a flood of lawsuits asserting generalized grievances against polluters large and small. Article III's standing requirement was designed to prevent just this sort of occurrence." 2011 WL 3924489, *10.

11

Plaintiffs' alleged injuries are based on generalized concerns over climate change

for which their organizations engage in advocacy, but this does not demonstrate the

necessary injury-in-fact to prove standing. *Sierra Club v. Morton*, 405 U.S. 727,

740 (1972).

2. **The Injury Alleged by Plaintiffs was not Caused by BLM's Leasing Decision**

Even if Plaintiffs could prove a "concrete and particularized" injury that was

"actual or imminent," they have failed to demonstrate that BLM's alleged NEPA

procedural violations are tied to their injury. To show the necessary causal

connection, a litigant's alleged injuries must be "fairly traceable" to the challenged

action. *Defenders of Wildlife*, 504 U.S. at 560; *Natural Res. Def. Council v. EPA*,

542 F.3d 1235, 1246 (9th Cir. 2008) (plaintiffs met traceability burden by showing

type of storm water discharge injuring them could be addressed by the issuance of

guidelines and rules contemplated by statute which would "likely . . . reduce the

risk of pollution causing their injury."). A "chain of causation [may have] more

than one link, but [may not be] hypothetical or tenuous." *San Joaquin River Grp.*

*Auth. v. Nat'l. Marine Fisheries Serv.*, --F. Supp. 2d--, 2011 WL 4591071, *13

(E.D. Cal. Sept. 30, 2011. The causation requirement "is only implicated where

the concern is that an injury caused by a third party is too tenuously connected to

the acts of the defendant." *Citizens for Better Forestry*, 341 F.3d at 975 (quoting

*Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1517-18 (9th Cir. 1992)).

Plaintiffs must clear a significant proof threshold to demonstrate causation. *Douglas County v. Babbitt*, 48 F.3d 1495, 1501 n.6 (9th Cir. 1995) (for standing in NEPA cases, plaintiffs must demonstrate "reasonable probability" that their injury-in-fact is caused by government's action or failure to act); *San Joaquin River Grp. Auth.*, 2011 WL 4591071 at *13 ("It is Plaintiffs' burden to prove by a preponderance of the evidence that its theory of causation is at least 'plausib[le].'") (quoting *Nat'l Audubon Soc'y v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002)). The emissions from development of oil and gas leases in Montana can hardly be said to have caused Plaintiffs' alleged injuries. For example, as a portion of global GHG emissions, BLM estimated that emissions from development of the challenged oil and gas leases issued by the Miles City Field Office, which constitute the majority of leases in this case, would amount to 0.000015% (AR 1199-1200); *see Amigos Bravos*, 2011 WL 3924489, *13 (finding 0.0009% contribution to global emissions was not sufficient to prove causation). The emissions from the challenged leases are miniscule in comparison to global emissions. Even if the court applied a "meaningful contribution" standard, applied by some courts, "[i]t stretches credibility to believe that the injuries Plaintiffs' members complain of - - less snowpack in winter, earlier runoffs in spring, reduced biodiversity, higher temperatures, decreased availability of water, and siltier rivers - - can be said to be fairly traceable to this relatively small amount of GHG emissions." *Amigos*

*Bravos*, 2011 WL 3924489, *13. Unlike the Clean Water Act cases where causation can be readily found when polluters upstream contribute to degradation of a water course, "climate change is a global phenomenon . . . dependant on an unknowable multitude of GHG sources and sinks, and it is impossible to say with any certainty that Plaintiffs' alleged injuries were the result of any particular action or actions by Defendants." *Id.*; *see also Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 878-80 (N.D. Cal. 2009) (rejecting contribution theory as basis for causation and holding "it is not plausible to state which emissions - - emitted by whom and at what time in the last several centuries and at what place in the world - - 'caused' Plaintiffs' alleged global warming related injuries"). As the court in *Amigos Bravos* said, "in order for the plaintiffs' injuries to be 'fairly traceable' to a particular defendant's actions, the plaintiffs cannot be 'so far downstream that their injuries cannot be fairly traced to that defendant.'" *Amigos Bravos*, 2011 WL 3924489, *13 (citation omitted).

Further, Plaintiffs' causation chain depends on the independent acts of third parties that are outside BLM's jurisdiction and, therefore, cannot be "fairly traceable" to the federal action. *See Lujan*, 504 U.S. at 562, 572 n.8; *Defenders of Wildlife*, 504 U.S. at 562. Courts have recognized that "[a] reduction of greenhouse gas emissions in one area or from one source has no effect on greenhouse gas levels that are specific to that area, and may even have no effect on

14

global greenhouse gas levels because other sources (including those in other countries) may increase their own emissions." *Sierra Club*, 2011 WL 3321296, *4 (internal citations omitted). Here, whether energy is developed from these leases or not, demand for oil and gas will be met by production from other sources elsewhere in the world. Moreover, Plaintiffs must agree that their assertions regarding climate change are dependent upon the independent actions of people around the world.

Plaintiffs have not proven standing because, unlike the facts in *Hall*, Plaintiffs' claims require a "chain of conjecture" which is too attenuated. *See Hall*, 266 F.3d at 977.

### 3. Plaintiffs Fail to Show Their Alleged Injuries Can Be Redressed

Plaintiffs' redressibility claims suffer from the same defects as their causation claims because they fail to demonstrate how an injunction requiring BLM to prepare additional NEPA analyses would avoid the harm they allege. As BLM has studied and demonstrated in the EAs and SIR, there is no emissions scenario where the disputed leases will have any material impact on climate change. Indeed, GHG emissions will continue to rise with or without the development of these leases. *See* AR 1134.

Plaintiffs may claim that because they assert a procedural interest, the requirement to show redressibility is relaxed. While Plaintiffs who establish a

procedural interest need not demonstrate that their injuries will be fully remedied by a favorable decision by the court - - that BLM will reach a different leasing decision after further NEPA review- - they must still "show that the procedural step was connected to the substantive result." *Mass. v. EPA*, 549 U.S. 497, 518 (2007). Plaintiffs are still required to show a non-speculative likelihood that the injury would be redressed by a favorable decision. *See Lujan*, 504 U.S. at 560-61; *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008) ("the redressibility requirement is not toothless in procedural injury cases").

This Plaintiffs cannot do. A BLM decision to impose GHG emission controls on oil and gas leases would do nothing to control ambient GHG concentrations, which depends on the actions of billions of third parties around the globe. *Sierra Club*, 2011 WL 3321296, *6 (finding court could "fashion no relief that accounts for these actions by countless parties" to establish plaintiffs' climate change-related NEPA claim was redressible). Given the global nature of the climate change issue and the entirely negligible role played by the oil and gas leases at issue, there is no remedy this court can fashion to redress Plaintiffs' alleged injuries.

Thus, because Plaintiffs fail to set forth specific facts showing a concrete and particularized injury-in-fact that is actual or imminent, that such injury was caused by BLM's alleged procedural violation, or that the injury could be

redressed by the court, they cannot show standing and their claims must be dismissed as non-justiciable.

### B. BLM Complied with NEPA

#### 1. NEPA Standard of Review

NEPA does not have an independent cause of action, so NEPA challenges are brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The role of the district court is to determine whether the final agency action is arbitrary, capricious, or otherwise unlawful. In its review of the administrative record, which forms the basis of the court's consideration of the question, the court's role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971); *see also Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc).

The agency is entitled to deference in judicial review conducted pursuant to the APA. A court may not sit as a "panel of scientists . . . instruct[ing] the [agency] how to validate its hypotheses . . . , choos[ing] among scientific studies in determining whether [the agency] has complied with the [relevant statute], and order[ing] the agency to explain every possible scientific uncertainty." *Lands Council*, 537 F.3d at 988. Reversal of final agency action based upon the "arbitrary and capricious" standard should be limited to those instances in which

17

the "record plainly demonstrates that the [agency] made a clear error in judgment." *Id*. at 994.

## 2. **Mineral Leasing Act ("MLA") Provisions**

No individual or entity may explore, drill for, remove, or dispose of oil and gas deposits on BLM lands without a lease under the MLA, 30 U.S.C. § 181, *et seq*. Although a lease is a prerequisite for oil and gas development, standing alone it does not authorize operations, which are subject to "stipulations attached to the lease; restrictions deriving from specific, nondiscretionary statutes; and such reasonable measures as may be required by the authorized officer to minimize adverse impacts to other resource values, land uses or users not addressed in the lease stipulations at the time operations are proposed." 43 C.F.R. § 3101.1-2. These "measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures." *Id*.

The offering and execution of leases pursuant to the MLA is the second stage in the process of the development of minerals owned by the federal government and is subsequent to the development of Resource Management Plans designed to guide BLM decisionmaking processes. At the third stage, a lessee may seek permission to engage in development activity by filing an application for a permit to drill ("APD"). 30 U.S.C. § 226(g) ("No permit to drill on an oil and gas

lease issued under [the MLA] may be granted without the analysis and approval by the Secretary . . . of a plan of operations covering proposed surface-disturbing activities within the lease area."); *see also* 43 C.F.R. § 3162.3-1(c), (d). An APD must include a drilling plan, "including a description of the drilling program, the surface and projected completion zone location, pertinent geologic data, expected hazards, and proposed mitigation measures to address such hazards." 43 C.F.R. § 3162.1(e); § 3162.1(t).

BLM maintains discretion to approve, modify, or deny the APD. *Id.* § 3162.3-1(h). Once an APD is approved, BLM maintains some control. For example, the agency may issue orders and notices to lessees to govern specific operations. *Id.* §§ 3160.0-5, 3161.2; *Id.* at § 3101.1-2 (lessee's right to use of leased lands is subject to "such reasonable measures as may be required . . . to minimize adverse impacts to other resource values, land uses, or users not addressed in the lease stipulations at the time the operations are proposed"). Plaintiffs' argument that BLM committed reversible error by failing to demand stipulations, as part of the lease sale requirements to mitigate emissions if development occurs in the future ignores both the structure of the leasing process and the consideration given to mitigation mechanisms in the administrative record.

### 3. NEPA Requirements

Under NEPA, major federal actions significantly affecting the quality of the human environment require an EIS. 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. § 1508.9; *see also Marsh v. Ore. Natural Res. Council*, 490 U.S. 360, 377 (1989). To determine whether an EIS is necessary, agencies may prepare an EA to analyze whether a proposed action would cause a significant impact to the environment necessitating an EIS. 40 C.F.R. § 1501.4.

NEPA requires that an agency take a "hard look" at the "reasonably foreseeable" effects of the proposed federal action and reasonable alternatives. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); 40 C.F.R. §§ 1502.14(a) (reasonable alternatives), 1508.8 (effects); *Lands Council*, 537 F.3d at 1001 (hard look requires "a full and fair discussion of environmental impacts"). Under the "hard look" standard, the court determines whether "the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh*, 490 U.S. at 378. BLM met its hard look responsibilities in this case.

### 4. NEPA Does Not Require BLM to Consider an Alternative Imposing GHG Lease Stipulations

Plaintiffs assert that BLM failed to consider an alternative requiring stipulations as part of the lease sale requirements to mitigate GHG emissions if development occurs in the future. First, the number and scope of the alternatives

considered by BLM were adequate. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005). Moreover, an agency's burden in considering alternatives is reduced when the agency has utilized an EA instead of an EIS. *Id.* Plaintiffs' argument ignores the reality of the oil and gas leasing and development process, which requires additional BLM approvals, NEPA review, and opportunities for imposing GHG controls as conditions of approval for drilling activity. As BLM explained in its response to Plaintiffs' and the EPA's comments, BLM will consider emissions controls when it receives requests for permits to drill. AR 1179-81. Thus, BLM has not foreclosed possible emissions controls, just deferred its decision on which to adopt until such time as a lessee actually proposes to develop the leases.

Nothing prohibits BLM from choosing to consider emissions controls at the development, as opposed to the leasing stage. Plaintiffs' reliance on *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) and *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983), to argue stipulations were required at the leasing stage is unfounded. In those cases, the EAs prepared in support of the leasing decisions assumed that leasing was a paper transaction that would not result in any physical or biological impacts, essentially deferring analysis of *any* on-the-ground impacts until a later date. *Conner*, 848 F.2d at 1442; *Sierra Club*, 717 F.2d at 1413. The Ninth and D.C. Circuits held that issuance of leases without "no surface

21

occupancy" stipulations was an "irreversible and irretrievable" commitment of resources requiring analysis of the reasonably foreseeable impacts of exploration and development of the leases. *Conner*, 848 F.2d at 1451; *Sierra Club*, 717 F.2d at 1415. The D.C. Circuit further explained: "While theoretically the proposed two-stage environmental analysis may be acceptable, in this situation the Department has not complied with NEPA because it has sanctioned activities which have the potential for disturbing the environment without fully assessing the possible environmental consequences." *Sierra Club*, 717 F.2d at 1415.

By contrast, here BLM did not treat the leasing decisions as paper transactions. In fact, though BLM admits it cannot know for certain whether and to what extent leases will be developed, it prepared a reasonable foreseeable development ("RFD") scenario to assist in analyzing the potential effects of on-the-ground development. *See, e.g.*, AR 1175-76 (Miles City Field Office EA). The leasing stage, like the first step in any multi-staged project, is subject to inherent uncertainties that may limit the impacts that can be deemed "reasonably foreseeable." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 977 (9th Cir. 2006). Indeed, in *Northern Alaska Environmental Center*, the Ninth Circuit upheld BLM's leasing decision over challenges alleging that BLM failed to sufficiently consider site-specific impacts. The court noted: "At the earliest stage, the leasing stage we have before us, there is no way of knowing what plans for development,

22

if any, may eventually materialize." *Id.* In these situations, BLM must address those impacts that are reasonably foreseeable and disclose uncertainties when they exist. *Id.*; 40 C.F.R. § 1502.22. That is exactly what BLM did here.

More importantly, BLM has not sanctioned one drilling technology or another by issuing leases. While true that the leases confer the right to develop the minerals, that right is qualified by BLM's authority to impose conditions of approval on drilling activity that will minimize impacts to the environment. 43 C.F.R. § 3101.1-2. Thus, BLM has not made an "irreversible and irretrievable" commitment to a particular drilling technology. Because the leasing decision was not the "go/no go" decision on emissions controls, BLM's decision not to include an alternative in the leasing EA based on imposing emissions controls was not a NEPA error.

Certainly, as EPA suggested in its comment letter, BLM had discretion to consider and possibly impose stipulations including emissions controls at the leasing stage. *See* Pl. Mem. at 14 (citing AR 13470). But, BLM also had discretion to wait to consider emissions controls until drilling proposals are submitted because BLM has not committed to any particular drilling method and can still impose conditions to mitigate impacts to the environment. 43 C.F.R. § 3101.1-2. BLM's decision to wait to consider specific emission control technologies was not arbitrary and capricious.

5. **BLM Took a "Hard Look" at GHG and Climate Change Implications of Leasing and Reasonably Concluded that Impacts Would Not Be Significant**

BLM prepared an EA and accompanying FONSI for each lease sale, which concluded that the leases would not have significant environmental impacts.

With respect to climate change impact analyses in the EAs, BLM focused on the analytical obstacles presented by current data and applications of them to determine the specific effects of a particular activity (*i.e.*, a small number of oil and gas leases in Montana) with respect to global climate change ("GCC") and/or levels of GHG emissions contributing to GCC. 40 C.F.R. § 1502.22. The FONSI is attributable, in part, to the state of the science, which precludes a determination of the marginal impacts of the BLM leases in question at a local, regional, national or global level regardless of analytic rigor. *See* AR 1136 (Miles City Field Office EA discussing difficulty in predicting "actual regional or site-specific changes or conditions that may be due to climate change during any specific timeframe").

Here, BLM took the requisite "hard look" at climate change impacts of potential development under NEPA and reasonably concluded that those impacts would not be significant given the global context of the alleged issue. In fact, BLM prepared an inventory of GHG emissions for each of the EAs' planning areas. Appendices B through I of the Climate Change SIR include hundreds of pages of Montana-specific data, including calculations and assumptions. AR

24

2142-2495. These data facilitated BLM's assessment of the direct, indirect, and cumulative impacts of GHG emissions associated with the potential development of the leases. Based on the RFD, BLM calculated the maximum volume of production for the leases, which allowed the government to calculate the level of potential GHG emissions. *See, e.g.*, AR 1177-78 (Miles City Field Office EA). Using this information and scientific analysis, 40 C.F.R. § 1500.1(b), BLM determined that the impacts of the proposed leases did not meet the threshold established for significant impacts in 40 C.F.R. § 1508.27.

As an example, based upon the quantitative analysis, the potential emissions from the development of the leases within the jurisdiction of the Miles City Field Office leased by BLM during the sale in December 2010 would make up 0.020 percent of the total GHG emissions statewide. AR 1199. When one considers the likely maximum emissions of the leases in comparison to total emissions in the United States, the percentage shrinks to 0.00011 percent. *Id.* Of course, the percentage contribution of the leases to GHG worldwide is considerably smaller - - just 0.000015 percent. AR 1200.

In attempting to quantify the GHG emissions and their likely impact on climate change and the impact of potential climatological changes for a specific locale, BLM reviewed existing regional data. For example, in Section 3.2.2 of the

Miles City EA, BLM described the inherent uncertainties in predicting GCC

effects on a regional or local scale. BLM stated,

> It is currently not possible to know with certainty the net impacts from developing lease parcels on climate. The inconsistency in results of scientific models used to predict climate change at the global scale coupled with the lack of scientific models designed to predict climate change on regional or local scales, limits the ability to quantify potential future impacts of decisions made at this level. It is therefore beyond the scope of existing science to relate a specific source of greenhouse gas emission or sequestration with the creation or mitigation of any specific climate-related environmental effects. Although the effects of greenhouse gas emissions in the global aggregate are well-documented, it is currently impossible to determine what specific effect GHG emissions resulting from a particular activity might have on the environment.

AR 1179. Given the minute contribution of developing the leases to climate

change, the impossibility of predicting localized impacts, and the host of mitigation

measures BLM committed to consider at the drilling stage, (*see, e.g.,* AR 1179-81

(Miles City Field Office EA)), BLM reasonably concluded that the impacts of its

leasing decision on climate change would be insignificant.

### 6. **NEPA did not Require BLM to Prepare an EIS**

Without significant direct, indirect, or cumulative impacts from the adoption

of the leasing alternative, BLM was not required to prepare EISs for the lease

sales. Plaintiffs allege that several of the regulatory factors to be considered in

determining significance weigh in favor of a finding of significance and the

requirement than an EIS be prepared. Pl. Mem. at 16-27 (citing 40 C.F.R. § 1508.27(b)).

Plaintiffs first claim that BLM's leasing decision is "highly controversial." Pl. Mem. at 16-22 (citing 40 C.F.R. § 1508.27(b)(4)). While there may be some differing information on methane's global warming potential, given the extensive Climate Change SIR and supporting site-specific analyses in the EAs, BLM had sufficient information to make an informed decision about the effects of leasing on climate change. *Robertson*, 490 U.S. at 349-50. And there is no evidence that the additional information Plaintiffs allege should have been considered was necessary to a reasoned choice among alternatives, 40 C.F.R. § 1502.22 - - *i.e.*, regardless of BLM's leasing decision, climate change effects are likely to continue.

Second, Plaintiffs allege that the cumulative impacts of surface-disturbing oil and gas development when added to the background effects of anticipated climate change will be significant and require an EIS. Pl. Mem. at 22-26 (citing 40 C.F.R. § 1508.27(b)(7)). However, NEPA does not require BLM to do the "impractical." *Inland Empire Pub. Lands Council v. United States Forest Serv.*, 88 F.3d 754, 764 (9th Cir. 1996). And to complete the type of site-specific analysis Plaintiffs request would be impossible. Indeed, as BLM points out in the EAs and SIR,

[I]t is difficult to impossible to identify specific impacts
of climate change on specific resources within the project
area. As summarized in the Climate Change SIR (2010),
climate change impacts can be predicted with much more
certainty over global or continental scales. Existing
models have difficulty reliably simulating and attributing
observed temperature changes at small scales. On
smaller scales, natural climate variability is relatively
larger, making it harder to distinguish changes expected
due to external forc[es] (such as contributions from local
activities to GHGs).

AR 1200 (Miles City Field Office EA (citing SIR)). BLM detailed the cumulative

effects to the extent possible; NEPA requires nothing more.

## III.    Conclusion

This Court should grant Defendant-Intervenors' cross-motion for summary

judgment due to Plaintiffs' failure to meet Article III standing requirements and

BLM's reasonable determination that impacts of leasing would be insignificant

based upon its "hard look." At the end of the day, the consideration of the impacts

of approximately 100 oil and gas leases on federal land in Montana is difficult

given the other sources of GHG emissions throughout the world. BLM's analysis

was robust even though the GHG emissions from the leases in question are an

infinitesimal component of the sample size. Plaintiffs cannot prove that the

issuance of this lease sale will cause a material change in GHG emissions and

cause impacts inadequately assessed by BLM under NEPA. The absence of

mitigation directives at the leasing stage cannot be construed as error or

28

inadvertence on the part of the government as BLM has authority to consider and impose emissions controls at the drilling stage. BLM's decisional documents fully explored means to reduce GHG emissions by operators at the time of development.

Dated this 18th day of November, 2011.

/s/ William W. Mercer
William W. Mercer

Attorney for Defendant-Intervenors
American Petroleum Institute,
Montana Petroleum Association,
Montana Chamber of Commerce,
and Western Energy Alliance

## CERTIFICATE OF COMPLIANCE

The undersigned, William W. Mercer, certifies that this Brief complies with the requirements of Rule 7.1(d)(2). The lines in this document are double spaced, except for footnotes and quoted and indented material, and the document is proportionately spaced with Times New Roman Font typeface consisting of fourteen characters per inch. The total word count is 6,465 words, excluding caption and certificates of compliance and service. The undersigned relies on the word count of the word processing system used to prepare this document.

/s/ William W. Mercer
William W. Mercer

5317273_2.DOCX