Ignacia S. Moreno
Assistant Attorney General
Environment & Natural Resources Division

Ruth Ann Storey
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 663
Washington, D.C. 20044-0663

Michael Cotter
U.S. Attorney
Mark Smith
Assistant U.S. Attorney
U.S. Attorney's Office
2929 Third Ave. North, Suite 400
Billings, MT 59101

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | | |
|---|---|---|
| MONTANA ENVIRONMENTAL INFORMATION CENTER, *et al.*, | ) ) ) | Case No. CV-11-15-M-SEH |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | CROSS-MOTION AND MEMORANDUM IN |
| UNITED STATES BUREAU OF LAND MANAGEMENT, *et al.* | ) ) ) | SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION AND IN |
| Defendants, | ) ) ) | OPPOSITION TO PLAINTIFFS' MOTION FOR |
| and | ) ) | SUMMARY JUDGMENT |
| American Petroleum Institute, *et al.* | ) ) ) | |
| Intervenor-Defendants. | ) ) ) | |

# INTRODUCTION

Pursuant to Fed. R. Civ. P. 56, Federal Defendants cross-move for summary judgment.

Plaintiffs challenge the decisions of the Bureau of Land Management ("BLM") to offer oil and gas leases on parcels of federal public lands scattered throughout Montana. The challenged leases were part of BLM's December 9, 2010 competitive oil and gas lease sale. Plaintiffs contend that BLM's decisions to sell and issue these leases failed to comply with the National Environmental Policy Act ("NEPA"). Plaintiffs' claims focus on a single issue that is not unique to these leases, but is shared by every federal agency action--indeed, every human action-- the release of greenhouse gases ("GHGs"), their possible contribution to global climate change and the resulting effects on the human environment.

Plaintiffs lack standing. The declarations submitted by Plaintiffs' members present no admissible or competent evidence that links the potential GHG emissions corresponding to BLM's leasing decisions to specific impacts that the members claim as the source of their injuries. In addition, Plaintiffs fail to show, or even allege, that the relief they seek would tangibly reduce their alleged injury. Plaintiffs thus have not established causation, or redressability, and their claims must be dismissed for lack of jurisdiction.

Even if Plaintiffs had standing, their claims are without merit. BLM was not required to analyze Plaintiffs' suggested GHG reduction measures as a separate alternative in the NEPA process. The environmental assessments ("EAs") and "findings of no significant impact" ("FONSI") that each BLM field office prepared for the lease parcels took the requisite "hard look" at the possible direct, indirect, and cumulative impacts from GHG emissions. In addition, BLM prepared a

comprehensive Supplementary Information Report ("SIR") on climate change. Based on both the EAs and the SIR, BLM reasonably concluded that the leases would have no significant impacts. Therefore, BLM was not required to prepare detailed environmental impact statements ("EIS").

In sum, Plaintiffs have not demonstrated that BLM's leasing decisions were "arbitrary and capricious," as they must do to prevail in this appeal under the Administrative Procedure Act ("APA"). Plaintiffs' motion for summary judgment should be denied and Federal Defendants' cross motiin for summary judgment should be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2008, these Plaintiffs challenged BLM lease sales in <u>MEIC v. BLM</u>, CV 08-178-M-DWM (D. Mont.). In March 2010, the parties settled that case by agreeing that BLM would suspend the 61 oil and gas leases at issue until BLM conducted further environmental review. AR 11943. On August 12, 2010, BLM released eight EAs assessing BLM's 2008 leasing decision, as well as BLM's decision to offer lease parcels from lease sales in 2010. <u>Id</u>. In addition, BLM prepared a SIR of Climate Change for Montana, North Dakota and South Dakota which included very detailed GHG emissions inventories; and calculations, and an analysis of potential future oil and gas development. The SIR was incorporated by reference in each of the EAs. AR 1133. Based on its review of the EAs and SIR, BLM concluded on that the sale of new leases, as well as the lifting of suspensions on previously sold leases, would have no significant impact on the human environment. <u>See</u> <u>eg.</u> AR 1101. On December 9, 2010, BLM held a lease sale for 222 parcels. AR 7552.

Plaintiffs filed a timely protest against the inclusion of all of the parcels in Montana, North Dakota and South Dakota in the December 9 lease sale. AR 11944. BLM denied their protest on December 27, 2010. AR 11942-11969. Plaintiffs filed this action on February 7, 2011, challenging only the sale of parcels and the lifting of suspensions on previously issued leases in Montana.

## LEGAL BACKGROUND

The purpose of NEPA is to ensure that agencies take a "hard look" at the environmental consequences of proposed actions. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989) (citeing Kleppe, 427 U.S. at 410 n.21.) It is well-settled, however, that NEPA is an "essentially procedural" statute and does not require an agency to follow the most environmentally sound course of action. Vt. Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978); Robertson, 490 U.S. at 350.

Regulations promulgated by the Council on Environmental Quality ("CEQ"), 40 C.F.R. §§ 1500-08, guide application of NEPA and are entitled to substantial deference. Robertson, 490 U.S. at 355-56. While NEPA requires federal agencies proposing "major Federal actions significantly affecting the quality of the human environment" to prepare an environmental impact statement ("EIS"), 42 U.S.C. § 4332(2)(C), the CEQ regulations recognize that not all agency actions will have significant environmental impacts. Thus, an agency may prepare an EA in the first instance – as BLM did here – to determine whether a significant impact exists which would necessitate an EIS. See 40 C.F.R. §§ 1501.3(a), 1501.4. If the agency determines after preparing an EA that the proposed action will not cause significant impacts, then the agency may issue a FONSI in lieu of preparing an EIS. 40 C.F.R. § 1501.4(e).

CEQ regulations define an EA as "a *concise* public document . . . that serves to *[b]riefly* provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact."  40 C.F.R. § 1508.9(a) (emphases added).  An EA should include "brief discussions of the need for the proposal, of [reasonable] alternatives as required by sec. 102(2)(E) [of NEPA]," and "of the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9(b).

An EIS, in contrast, is "a detailed written statement" that requires in-depth analysis of all potential impacts.  See 40 C.F.R. §§ 1502, 1508.11.  An EA thus "allows the agency to consider environmental concerns, while reserving agency resources to prepare full EIS's for appropriate cases."  Sierra Club v. U.S. Dep't. of Transp., 753 F.2d 120, 126 (D.C. Cir. 1985); see also River Road Alliance, Inc. v. U.S. Corps of Eng'rs., 764 F.2d 445, 449 (7th Cir. 1985) ("The purpose of an [EA] is to determine whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an [EIS].").

## STANDARD OF REVIEW

Judicial review of final agency action is governed by the Administrative Procedure Act ("APA"). See Pls. Br. at 7 (citing 5 U.S.C. § 706(2)(A)(C)(D)); Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882 (1990). "[T]he scope of review under the [APA] standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Under the "arbitrary and capricious" standard, "administrative action is upheld if the agency has 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 982 (9th Cir.

1985) (quoting <u>Baltimore Gas & Elec. Co. v. NRDC</u>, 462 U.S. 87, 105 (1983)).
The court's role is solely to determine whether "the decision was based on
consideration of the relevant factors and whether there has been a clear error of
judgment." <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402, 416 (1971).
This standard is "exceedingly deferential." <u>Fund for Animals, Inc. v. Rice</u>, 85 F.3d
535, 541 (11th Cir. 1996). "While we may not supply a reasoned basis for the
agency's action that the agency itself has not given, we will uphold a decision of
less than ideal clarity if the agency's path may reasonably be discerned." <u>Bowman
Transp., Inc. v. Arkansas-Best Freight System, Inc.</u>, 419 U.S. 281, 285-86 (1974);
see also <u>Friends of the Earth v. Hintz</u>, 800 F.2d 822, 831 (9th Cir. 1986) ("The
court may not set aside agency action as arbitrary and capricious unless there is no
rational basis for the action."). "The [agency's] action . . . need be only a
reasonable, not the best or most reasonable, decision." <u>Nat'l Wildlife Fed'n v.
Burford</u>, 871 F.2d 849, 855 (9th Cir. 1989).

In deciding disputes that involve primarily issues of fact that "'require[] a
high level of technical expertise,' [the court] must defer to 'the informed discretion
of the responsible federal agencies.'" <u>Marsh v. Or. Natural Res. Council</u>,
490 U.S. 360, 377 (1989) (quoting Kleppe v. Sierra Club, 427 U.S. 390, 412
(1976)); see also <u>Baltimore Gas</u>, 462 U.S. at 103 ("When examining this kind of
scientific determination . . . a reviewing court must generally be at its most
deferential"); <u>Lands Council v. McNair</u>, 629 F.3d 1070, 1074 (9th Cir. 2010)
("[W]e generally must be 'at [our] most deferential' when reviewing scientific
judgments and technical analysis within the agency's expertise."). Thus, when
dealing with federal public lands management issues, a federal agency such as

BLM "must have discretion to rely on the reasonable opinions of its own qualified experts." <u>Marsh</u>, 490 U.S. at 378.

## ARGUMENT

**I. Plaintiffs' Claims Must be Dismissed for Lack of Jurisdiction Because Plaintiffs Lack Standing**

Each of Plaintiffs' claims must be dismissed for lack of jurisdiction. The judicial power of the United States "is not an unconditioned authority to determine the [legality] of legislative or executive acts." <u>Valley Forge Christian Coll. v.</u> <u>Americans United for Separation of Church and State</u>, 454 U.S. 464, 471 (1982). Rather, under Article III, § 2 of the Constitution, a district court has jurisdiction to hear a plaintiff's claims only if they give rise to a "case" or "controversy." <u>Raines</u> <u>v. Byrd</u>, 521 U.S. 811, 818 (1997). This limitation is founded on the Framers' "concern about the proper – and properly limited – role of the courts in a democratic society." <u>Summers v. Earth Island Inst.</u>, 129 S.Ct. 1142, 1149 (2009). The doctrine of standing reflects this fundamental limitation on the jurisdiction of Article III courts. <u>Daimler Chrysler v. Cuno</u>, 547 U.S. 332, 342 (2006).

### A. Elements of Constitutional Standing

In <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992), the Supreme Court articulated the test for Article III standing, which requires a plaintiff to demonstrate three elements: (1) an injury-in-fact: that is, an injury which is "concrete and particularized" and either "actual or imminent;" (2) a "causal connection" between the alleged injury and the conduct complained of; and (3) a likelihood, as opposed to mere speculation, that the injury will be "redressed by a favorable decision." <u>Id</u>. at 560-61 (citations omitted). These factors represent the "irreducible constitutional minimum" of standing. <u>Id</u>. at 560. When, as here, plaintiffs "[are] not [themselves] the object of the government action or inaction [they] challenge[

], standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." Id. at 562 (citation omitted).

A plaintiff seeking to invoke a district court's jurisdiction must carry its burden of proof as to each factor:

> Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'

Id. at 561 (citations omitted).

## B.    Plaintiffs' Declarations Fail to Demonstrate Standing.

Plaintiffs have not met their burden of demonstrating that they have standing in this case. In an effort to meet that burden, the plaintiff organizations have filed declarations from five members.[1/] MEIC Br. Exs 1-2,4-6. As explained below, Plaintiffs cannot show that GHG emissions pertaining to the challenged leases threaten perceptible and injurious changes to the local climate. In addition, there is no order this Court can issue that would have any chance of preventing or even

---

[1/]    To have standing, the plaintiff organizations must have members with standing. See generally Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 342 (1977) (setting forth standards for organizational standing); see also Summers, 129 S. Ct. at 1149 ("It is common ground that the respondent organizations can assert the standing of their members."). Accordingly, the standing analysis focuses on the five declarations filed by members to support the standing allegations of the organizations.

reducing Plaintiffs' alleged injuries in any tangible way.  Accordingly, Plaintiffs' alleged injuries stemming from global climate change are not redressable.

### 1. Plaintiffs have not Satisfied the Causation Prong of the Standing Inquiry

Plaintiffs' declarations do not demonstrate "a causal connection between the injury and the conduct complained of." Defenders, 504 U.S. at 560.  Plaintiffs' alleged injury is not the emission of GHGs from the development of the leases at issue here, but rather the environmental effects that occur as a result of global climate change.  Thus, Plaintiffs must show that thos alleged environmental impacts are fairly traceable to GHG emissions from the challenged lease sales. Defenders, 504 U.S. at 560-61.  More specifically, plaintiffs must show that the GHG emissions they seek to prevent would make a "meaningful contribution" to the manner in which climate change impacts the environment in their vicinity. Amigos Bravos v. BLM, ___ F. Supp. 2d ___, 2011 WL 3924489, at * 12 (D.N.M. Aug. 3, 2011) (quoting Mass. v. EPA, 549 U.S. 497, 523-25 (2007).

Plaintiffs have completely declined to address the causation prong of the standing analysis, presenting neither argument nor evidence.  They have therefore, failed to meet their burden on this element.  The situation here is quite different from that in Mass. v. EPA, where the Supreme Court found a causal connection between EPA's refusal to regulate GHGs and Massachusetts' injuries (lost coastline due to sea level rise).  The conclusion in Mass. v. EPA  was based on the affidavit of a climate scientist indicating a "strong consensus" among qualified scientific experts that climate change was likely to cause "a precipitate rise in sea levels," and on unchallenged evidence of a rise in global sea levels, "somewhere between 10 and 20 centimeters over the 20th century as a result of global

warming." 549 U.S. at 521-22. No comparable evidence specific to local impacts is presented here.

Even if Plaintiffs had carried their burden of adducing evidence, they would nonetheless lack standing because they cannot show that annual GHG emissions pertaining to oil and gas activities on the challenged leases would make a "meaningful contribution" to global $CO_2$ emissions. As the court pointed out in Amigos Bravos, there are millions if not billions of sources of GHGs that contribute to climate change. Amigos Bravos, 2011 WL 3924489, at * 13 That court concluded that the 92 oil and gas leases in New Mexico would produce no more than 254,730 metric tons of GHGs per year or just 0.0009% of global emissions and that the plaintiffs injuries could not be fairly traced to that relatively small amount of GHG emissions. Id.

By contrast, in concluding that nationwide motor vehicle emissions made a "meaningful contribution" in Mass. v. EPA, the Supreme Court was influenced by evidence that those emissions in 1999 alone accounted for the release of 1.7 billion tons, or more than 6% of *worldwide* GHG emissions in that year. By contrast, the $CO_2$ contribution of oil and gas development on the leases at issue here would be dramatically lower. Record evidence shows that, if these leases are fully developed, the potential emissions would amount to only .0205% of the annual GHG emissions for Montana in 2005. AR 11956. The fraction would be even smaller if the project emissions were compared to GHG emissions worldwide – just .000015%. AR 1199 - 1200. Thus, the total percentage of global GHG emissions that can be attributed to the challenged leases is orders of magnitude smaller than the 6% observed in Mass. v. EPA. Indeed, it is even smaller than the 0.0009% observed in Amigos Bravos. Plaintiffs have not presented, evidence to

show a causal link between this infinitesimal contribution to global $CO_2$ emissions and the injuries that Plaintiffs are allegedly suffering as a result of climate change. Thus, as in Amigos Bravos, Plaintiffs claims should be dismissed for failure to show causation.  See also Sierra Club v. U.S. Defense Energy Support Center, Civil Action No. 01:11–cv–41, Slip copy, 2011 WL 3321296, at *4-5, 7 (E.D. Va., July 29, 2011) (dismissing climate change-related claim for failure to show causation, and on prudential grounds).

**2.     Plaintiffs have not Satisfied the Redressability Prong of the Standing Inquiry**

Even if the declarations showed the necessary causal connection, Plaintiffs must also demonstrate that it is "'likely,' as opposed to merely speculative,' that the injury will be 'redressed by a favorable decision.'"  Defenders, 504 U.S. at 561. Plaintiffs must show that the relief sought may cause a change to the manner in which global climate change is manifested in the Plaintiffs' environment – not merely that it would reduce GHG emissions.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 107 (1998) ("Relief that does not remedy *the injury suffered* cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.") (emphasis added).  The change resulting from the above-described relief must also be perceptible – it must tangibly alter the manner in which global climate change affects the Plaintiffs.  See Pritikin v. Dep't of Energy, 254 F.3d 791, 799 (9th Cir. 2001) (explaining that a decision must be capable of producing "tangible, meaningful results in the real world" in order for a claim to be redressable); accord Warth v. Seldin, 422 U.S. 490, 508 (1975). Finally, in making the requisite showing, Plaintiffs may not rely on assertions that other GHG reduction initiatives undertaken by third parties may, in combination with the requested relief in this case, produce some tangible result. The Ninth

Circuit has made clear that "there is no redressability, and thus no standing, where (as is the case here), any prospective benefits depend on an independent actor who retains broad and legitimate discretion the courts cannot presume either to control or to predict." Glanton v. AdvancePCS, Inc., 465 F.3d 1123, 1225 (9th Cir. 2006); accord Lujan v. Defenders of Wildlife, 504 U.S. 555, 562 (1992); see also Dellums v. U.S. Nuclear Regulatory Comm'n, 863 F.2d 968, 980 (D.C. Cir. 1988) ("[W]hen numerous third parties and independent variables lead to an injury, the complainant has the burden of showing that but for the particular governmental action that he is challenging, the injury would abate.").

Plaintiffs have not carried their burden in this case. As noted above, even an order prohibiting all development of the leases would reduce global annual GHG emissions by an insignificant amount. Plaintiffs fail to show that this minuscule reduction would cause a tangible change to the manner in which global climate change is manifested on the "BLM [lands] and other lands in Montana" that Plaintiffs allegedly use and enjoy. Complaint ¶ 17. See Citizens for a Better Env't, 523 U.S. at 107 (holding that the relief requested must "remedy the injury suffered"); Cf. Schlesinger v. Reservist Comm. To Stop the War, 418 U.S. 208, 221-222 (1974) ("The desire to obtain []sweeping relief[] cannot be accepted as a substitute for compliance with the general rule that the complainant must present facts sufficient to show that *his individual need* requires *the remedy for which he asks*.'") (emphasis added).

In sum, Plaintiffs have not made the requisite showing that their alleged injuries are caused by BLM's actions, and would be redressed by a favorable ruling. Accordingly, Plaintiffs' claims of climate-based harm must be dismissed for lack of standing.

## II. BLM Fully Complied with NEPA.

Assuming that Plaintiffs have standing to raise their claims, and they do not, they have failed to show that BLM did not fully comply with the requirements of NEPA by issuing the FONSIs for the oil and gas leasing EAs.

### A. BLM Considered A Reasonable Range Of Alternatives For An EA

Plaintiffs' first argument is that BLM violated NEPA by failing to consider, in each of the EAs, an alternative that would subject the oil and gas leases to stipulations that would prevent and minimize GHG emissions. MEIC Br. at 9-15. However, BLM's range of alternatives in all of the EAs was adequate and fully complied with NEPA.

An EA should include "brief discussions of the need for the proposal, of [reasonable] alternatives as required by sec. 102(2)(E) [of NEPA]," and "of the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9(b). But, an EA need not examine as broad a range of alternatives as an EIS, because the necessary range of alternatives diminishes as the expected impacts diminish. "When an agency makes an informed decision that the environmental impact will be small, a view which we are required to accord deference . . . a less extensive search [for reasonable alternatives] is required." Greater Yellowstone Coal. v. Flowers, 359 F.3d 1257, 1278-79 (10th Cir. 2004) (quotations and citation omitted). See also Friends of the Ompompanoosuc v. FERC, 968 F.2d 1549, 1558 (2d Cir. 1992) (holding that the "range of alternatives an agency must consider is narrower when, as here, the agency has found that a project will not have a significant environmental impact"); Sierra Club v. Espy, 38 F.3d 792, 796, 803 (5th Cir. 1994) ("While an EA must contain a discussion of

alternatives, the range of alternatives that the [agency] must consider 'decreases as the environmental impact of the proposed action becomes less and less substantial.'"); River Rd. Alliance, 764 F.2d at 452 ("[T]he smaller the impact, the less extensive a search for alternatives can the agency reasonably be required to conduct.").

As discussed below, BLM reasonably concluded that GHG emissions from any possible development of the lease parcels would not have a significant impact on climate change. It was thus under no obligation to explore in detail in a separate alternative ways of mitigating impacts that it determined to be insignificant. "[I]t makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined . . . will have no significant environmental effects anyway." Espy, 38 F.3d at 803 (quotation marks and citation omitted); accord Mo. Mining, Inc. v. ICC, 33 F.3d 980, 984 (8th Cir. 1994). See also Audubon Naturalist Soc. v. U.S. Dep't of Transp., 524 F. Supp. 2d 642, 708 (D. Md. 2007) (holding that federal agency "did not act arbitrarily or capriciously in concluding that no particular mitigation is needed . . . for the supposed impacts of a single stretch of highway on the global problem of climate change").

Given the minimal environmental impacts of the proposed lease sales, the BLM's consideration of a preferred alternative and a "no action" alternative in each of the EAs is in line with Ninth Circuit cases upholding the range of alternatives for similar projects of limited scope and magnitude. See, e.g., Native Ecosystems Council v. U.S. Forest Service, 428 F.3d 1233, 1245-49 (9th Cir. 2005) (upholding as reasonable EA that analyzed in detail only "no action" alternative and proposed action alternative for a vegetation management project).

However, BLM did, in fact, consider Plaintiffs' proposal to include GHG reduction technologies and practices as stipulations for the leases although not as a separate alternative.[2]  For example, BLM stated:

> While it is not possible to predict effects on climate change of potential GHG emissions discussed above in the event of lease parcel development for alternatives considered in this EA, the act of leasing does not produce any GHG emissions in and of itself.  Releases of GHGs would occur at the exploration/development stage.

> Measures may also be required as COAs [conditions of approval] on permits by either the BLM or the applicable state air regulatory agency.

AR 1179.  And further,

> More specific to reducing GHG emissions, Section 6 of the Climate Change SIR identifies and describes in detail commonly used technologies to reduce emissions from natural gas, coal bed natural gas, and oil production operations.  Technologies . . . summarized below. . . display common methane emission technologies reported under the USEPA [United States Environmental Protection Agency] Natural Gas STAR program and associated emission reduction, cost, maintenance and payback data.

AR 1180.

While BLM did not adopt Plaintiffs' proposal for mitigation, it analyzed the effectiveness of potential future GHG emissions reductions that might be feasible. AR 1181.  And advised that the appropriate place to assess and develop strategies regarding GHG emissions would be at the APD or other site-specific development stage when actual proposals to drill or undertake other ground-disturbing activities have been developed: "Mitigation considers site-specific conditions in order to be adaptive and responsive to changing technology and/or emissions reductions practices, allowing the BLM to be consistent with the goals and objectives

_____

[2]  NEPA's implementing regulations indicate that an agency may consider mitigation measures either separately or as part of the proposed action and its alternatives.  The agency need not do both.  See 40 C.F.R. § 1502.14(f).

identified in larger-scale action plans, as wee as adaptive to changes in state and federal regulations and BLM plicies."  AR 11947.  Thus, it is only at this latter stage that BLM can determine with specificity what mitigation strategies and technologies are appropriate for the proposed development activities.

BLM's position is eminently reasonable, and satisfies any obligations it might have had under NEPA to consider and address Plaintiffs' GHG emission reduction strategies.  The issuance of the leases does not foreclose any opportunity for BLM to address GHG emissions from oil and gas operations on the lease parcels.  Although the issuance of a BLM oil and gas lease gives the lessee some right of surface use of the lease parcel that does not prevent BLM from imposing mitigation measures at the APD or other implementation stages to reduce GHG emissions.  See eg. 43 C.F.R. 3101.1-2 and 43 C.F.R. 3162.3-1(h)(1).

Because development of lease parcels offered in the December 9, 2010 lease sales may never occur, may include voluntary GHG reduction measures, or may be required to include such measures as conditions of approval at the APD stage, there is no basis to conclude that issuing the leases will result in unmitigated GHG emissions.  An alternative that includes mitigation measures for activities that may never occur or that will be implemented anyway under the proposed action does not present a substantially different approach than is already being analyzed in the EA.  See N. Plains Res. Council v. Lujan, 874 F.2d 661, 666 (9th Cir. 1989) ("NEPA does not require a separate analysis of alternatives with consequences indistinguishable from the action proposed.").  BLM's approach not only complies with NEPA, it also is far more flexible and adaptive than the position advocated by Plaintiffs because it allows BLM's experts to review actual plans for development to determine whether and which GHG mitigation measures

are necessary to minimize possible emissions.[3]

The Ninth Circuit has endorsed the notion that BLM oil and gas lease-stage decisions are not subject to the full rigors of a NEPA analysis that might be required once development of those leases is actually proposed at the APD stage. See N. Alaska Envtl Center v. Kempthorne, 457 F.3d 969, 977 (9th Cir. 2006) (holding that it is appropriate for agency to address uncertainties in its NEPA analysis "at later permitting stages when the sites, and hence more site specific effects, are identifiable"); see also Tribal Vill. of Akutan v. Hodel, 869 F.2d 1185, 1191–92 (9th Cir. 1988) (recognizing that under OCSLA, additional environmental analysis will be developed subsequent to lease sale stage) (citing Vill. of False Pass, 733 F.2d 605).

BLM's explanation for not addressing Plaintiffs' suggested GHG emission mitigation measures in greater detail or as a separate alternative at the leasing stage of BLM's oil and gas decision-making process was reasonable and consistent with the Ninth Circuit's decisions in N. Alaska Envtl Center and Tribal Vill. of Akutan v. Hodel. Potential development of the lease parcels is far from definite until APDs are actually submitted for each parcel. Thus, developing and analyzing mitigation measures at the lease stage – as an alternative or otherwise – -would be a speculative endeavor and a waste of federal resources. See Headwaters Inc. v. BLM, Medford District, 914 F.2d 1174, ___ (9th Cir. 1990) (NEPA "does not require the consideration of alternatives 'whose effects cannot be reasonably

---

[3] Notably, Plaintiffs do not seek to prevent the issuance of leases; they seek only to ensure that BLM considers and, where appropriate, imposes GHG mitigation measures on their development. CITE (IF ACCURATE). Given this, Plaintiffs have no basis for objecting to BLM's decision to undertake its consideration of mitigation measures at the APD – rather than the leasing – stage

ascertained, and whose implementation is deemed remote or speculative.'") (citation omitted).

In sum, the potential development activities that Plaintiffs argue should be analyzed at the lease stage may never occur. And if any development does ultimately occur, it can be analyzed as part of a separate BLM permitting process, which may include the consideration of mitigation measures, and which may benefit from whatever new mitigation technologies are available at that time. Plaintiffs have thus failed to establish that NEPA required BLM to analyze any particular alternative, and this claim must fail.

**B.      BLM Was Not Required To Prepare EISs For Its Lease Sales**

The decision whether to prepare an EIS or issue a FONSI "is a factual determination which implicates agency expertise and accordingly, is reviewed under the deferential arbitrary and capricious standard of review." Comm. to Pres. Boomer Lake, 4 F.3d at 1555. The party challenging the agency's decision to issue a FONSI bears the burden of establishing that the agency's decision was arbitrary and capricious. Id. This burden is a heavy one, because the Court's scope of review is limited to "whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment." Marsh, 490 U.S. at 378. As the Supreme Court has explained, "[a]n agency's decision not to prepare an EIS can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Public Citizen, 541 U.S. at 763.

As discussed above, each of the oil and gas leasing EAs, which incorporated by reference the Climate Change SIR, analyzed the potential for BLM's leasing decisions to contribute to GHG emissions. Even based on "worst case" emissions

calculations – calculations that included all annual well development in each field office area, that assumed the leases issued would be fully developed, and that did not deduct for GHG emissions mitigation measures that would be implemented at the APD and later stages of development – these EAs rationally concluded that oil and gas lease development from the issued leases would not significantly contribute to GHG emissions in Montana or globally, individually or cumulatively. AR 1199-1200. In turn, BLM reasoned that, because the current science does not allow determinations to be made about the specific effects of specific actions with regard to the issue of global climate change, preparation of an EIS was not warranted, as it would not mandate further meaningful analysis with respect to significance. AR 11950. Plaintiffs have not shown that BLM's decisions not to prepare EISs at the lease stage were arbitrary and capricious.

Plaintiffs argue that the NEPA regulations for assessing significance, 40 C.F.R. § 1508.27, dictate that BLM erred in finding no significant impacts because the estimates of GHG emissions attributable to oil and gas development in the EAs and Climate Change SIR were "highly uncertain" or incomplete, and thus "highly controversial." They also argue that BLM failed to consider the cumulative effects of oil and gas development and climate change. MEIC Br. at 16-27. Plaintiffs' arguments are misplaced.

The NEPA regulations identify that one of the factors in considering significance is the degree to which the possible effects on the quality of the human environment are likely to be "highly controversial." 40 C.F.R. § 1508.27(b)(4). The fact that Plaintiffs or others disagree with the decision does not, in itself, establish controversy. Presidio Golf Club v. Nat'l Park Serv., 155 F.3d 1153, 1162 (9th Cir. 1998) (The existence of opposition does not automatically render a

19

project controversial.)  Another factor is the degree to which the possible effects on human environment are" highly uncertain."  40 C.F.R. § 1508.27(b)(5).  The adjective "highly" is important.  Any controversy or uncertainty does not meet this standard, it must be "highly" controversial or uncertain.

Plaintiffs assert that the decisions are "highly controversial" and "highly uncertain" because BLM used incorrect assumptions in gauging the impact of GHG emissions.  MEIC Br. at 16-22, 26-27.  While BLM acknowledges that accurate and precise estimates are difficult to develop given the level of data available to the agency, the EAs and Climate Change SIR estimates are consistent with USEPA's current methods for calculating emissions.  AR 11951.  That approach is hardly "highly controversial " and "highly uncertain."  While BLM's calculations of emissions may not offer the precision advocated by Plaintiffs, there is no controversy or uncertainty that undermines BLM's unassailable determination that – whatever the precise GHG emissions from the hypothetical wells on these leases may be – those emissions would be trivial in comparison to other GHG emission sources, would have no measurable effect on climate change, and thus would have no significant environmental impact.

When determining significance, agencies also must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts."  40 C.F.R. § 1508.27(b)(7).  Plaintiffs argue that the significance threshold is triggered because the BLM failed to consider the impacts of oil and gas development in combination with the impacts of climate change.  MEIC Br. at 22-26.  However, BLM offered a reasoned response to this very concern in the leasing EAs.

> [I]t is difficult to impossible to identify specific impacts of climate change on specific resources within the project area.  As summarized in the Climate

Change SIR(2010), climate change impacts can be predicted with much more certainty over global or continental scales. Existing models have difficulty reliably simulating and attributing observed temperature changes at small scales. On smaller scales, natural climate variability is relatively larger, making it harder to distinguish changes expected to external forc[es] (such as contributions from local activities to GHGs)

AR 1200.

Despite uncertainties in climate change science, in particular how climate change will impact any given region of the planet, see Amigos Bravos, 2011 WL 3924489, at * 7, the EAs and Climate Change SIR adequately considered climate change and the reasonably foreseeable cumulative impacts resulting from the leasing decision. The level of analysis Plaintiffs demand is simply not required by NEPA, nor is it scientifically possible.

### CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' motion for summary judgment and grant Federal Defendants' cross-motion.

Dated December 16, 2011                    Respectfully submitted,

                                           Ignacia S. Moreno
                                           Assistant Attorney General
                                           Environment & Natural Resources
                                           Division

                                           /s/ Ruth Ann Storey
                                           Ruth Ann Storey
                                           Trial Attorney
                                           U.S. Department of Justice
                                           Environment & Natural Resources
                                           Division
                                           Natural Resources Section
                                           Ben Franklin Station, P.O. Box 663
                                           Washington, D.C. 20044-0663

## CERTIFICATE OF COMPLIANCE

I, Ruth Ann Storey, certify that this brief complies with the requirements of Local Rule 7.1(d)(2).  The document is proportionally spaced, has a typeface of 14 points and contains 5917 words.  I relied on the word count from WordPerfect which was used to prepare the document.

/s/ Ruth Ann Storey
Ruth Ann Storey