

**FILED**

**JUN 1 4 2013**

Clerk, U.S. District Court
District Of Montana
Helena

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MONTANA**

**GREAT FALLS DIVISION**

MONTANA ENVIRONMENTAL
INFORMATION CENTER, et al.

Plaintiffs,

vs.

UNITED STATES BUREAU OF
LAND MANAGEMENT, et al.

Federal Defendants,

vs.

AMERICAN PETROLEUM
INSTITUTE, et al.,

Defendant-Intervenors.

No. CV-11-15-GF-SEH

**MEMORANDUM
AND ORDER**

**INTRODUCTION**

This case arises from the decision of the United States Bureau of Land

Management (BLM) to execute and sell certain oil and gas leases on federal land

in Montana in 2008 and 2010. Plaintiffs, Montana Environmental Information

Center (MEIC), Earthworks Oil and Gas Accountability Project, and WildEarth

Guardians, claim BLM violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, by failing to adequately consider climate change, global warming, and greenhouse gases (GHGs) before it approved the lease sales. Plaintiffs seek declaratory and injunctive relief under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06 for the alleged NEPA violations.

## BACKGROUND

### A. NEPA

NEPA is a procedural statute that requires federal agencies to take a "hard look" at the environmental consequences of its proposed actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Regulations promulgated by the Council on Environmental Quality (CEQ), 40 C.F.R. §§ 1500-08, guide application of the statute. *Robertson*, 490 U.S. at 355-56.

The Act prescribes the process an agency must follow in undertaking a proposed action. *WildEarth Guardians v. U.S. Forest Serv.*, 828 F. Supp. 2d 1223, 1236 (D. Colo. 2011); *San Joaquin River Group Auth. v. Natl. Marine Fisheries Serv.*, 819 F. Supp. 2d 1077, 1104 (E.D. Cal. 2011). It does not state requirements relating to outcome of the decision-making process. *Robertson*, 490 U.S. at 350. If the record demonstrates that the agency followed NEPA procedures, the Court is not to question the wisdom of the decision. *WildEarth Guardians*, 828 F. Supp.

2d at 1236.

If an agency proposes a major federal action that will "significantly affect the quality of the human environment," NEPA requires that it prepare an Environmental Impact Statement (EIS) before undertaking the action. 42 U.S.C. § 4332(2)(C). Duty to prepare the EIS is triggered if "substantial questions" are raised as to whether a project will significantly affect the quality of the human environment. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238-39 (9th Cir. 2005).

An EIS is a detailed, in-depth analysis of all potential environmental impacts to the human environment. 40 C.F.R. §§ 1502.1, 1508.11; 42 U.S.C. § 4332(2)(C)(i). It must "[r]igorously explore and objectively evaluate" all reasonable alternatives[1] to a proposed action in order to provide a clear basis for choice among the options. 40 C.F.R. § 1502.14(a).

The agency may conduct an Environmental Assessment (EA) to determine whether an EIS is necessary if it is uncertain whether a proposed action will have a significant impact on the environment. *Id.* at §§ 1501.3(a), 1501.4, 1508.9(a)(1); *River Road Alliance, Inc. v. Corps of Engrs. of the U.S. Army*, 764 F.2d 445, 449

---

[1] The term reasonable alternatives generally means feasible alternatives. Alternatives that are remote, speculative, impractical, or ineffective are not reasonable. *WildEarth Guardians*, 828 F. Supp. 2d at 1237.

3

(7th Cir. 1985) ("The purpose of an environmental assessment is to determine whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an environmental impact statement."). The EA focuses on the context and intensity of the proposed action. 40 C.F.R. § 1508.27(a)-(b).[2]

NEPA requires the agency to issue a "finding of no significant impact" (FONSI) in lieu of an EIS if it determines, based upon an EA, that a proposed action will have no significant impact on the environment. *Id.* at § 1501.4(e). The FONSI must include the EA or a summary of it. *Id.* at § 1508.13. It must also include a "convincing statement of reasons" explaining why the proposed action will not have a significant impact on the human environment. *Ocean Advocs. v. U.S. Army Corps. of Engrs.*, 402 F.3d 846, 864 (9th Cir. 2005).

## B. **BLM's Decision-Making Process for Oil and Gas Development**

BLM manages oil and gas development through a three phase decision-making process. *Pennaco Energy, Inc. v. U.S. Dept. of Interior*, 377 F.3d 1147,

---

[2] "Context delimits the scope of the agency's action, including the interests affected." *Ctr. for Biological Diversity v. Natl. Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008). "Intensity" means "the severity of the impact." *Id.* The federal regulations describe ten factors to be considered in determining intensity. 40 C.F.R. § 1508.27(b)(1)-(10).

4

1151 (10th Cir. 2004).  Each phase is distinct and serves a particular purpose.

### 1.    Planning Phase

In the first phase, the planning phase, BLM prepares a Resource

Management Plan (RMP) in accordance with 43 C.F.R. § 1601.0-5(k).  *See Norton*

*v. S. Utah Wilderness Alliance*, 542 U.S. 55, 59 (2004).  The RMP identifies

general geographical areas that may be appropriate for oil and gas leases.

### 2.    Development Phase

In the second phase, the lease development phase, BLM considers

comments from oil and gas companies concerning parcels of land in which they

have an interest.  It then determines whether it will execute leases for a specific

parcel.  In making this determination, it may conduct an EA, as was done in this

case.  If it is determined, based upon the EA or otherwise, that its proposed action

will have a significant affect on the environment, it is obliged to prepare a more

detailed EIS that rigorously explores and objectively evaluates all reasonable

alternatives to the proposed action.

After the EA or EIS on proposed leases is conducted, BLM has three basic

options:

> 1.    It may determine that the proposed leases should not
> be executed (i.e., a "no  action" alternative);

5

2.     It may execute the requested leases subject to
       standard "stipulations" (i.e., terms and conditions);
       or

3.     It may execute the leases but require additional
       stipulations that impose further restrictions on the
       lessee.

The stipulations become part of the lease and provide the lessee with notice

of its development-phase obligations.  *See* 43 C.F.R. § 3101.1-2.  Leases are then

sold in accordance with the procedures set forth in 43 C.F.R. pt. 3120.

### 3.     Permit Phase

In the third phase, the lease permit phase, the purchaser of a lease must seek

permission from BLM to drill a well by filing an application for permit to drill

(APD).  *Id.* at § 3162.3-1(c)-(d); 30 U.S.C. § 226(g).  The APD must include a

drilling plan.  The drilling plan must address a number of matters including

measures to mitigate environmental hazards.  43 C.F.R. § 3162.3-1(e).  Discretion

to approve, modify, or deny the ADP is retained.  *Id.* at § 3162.3-1(h).  Certain

"conditions of approval"  may also be imposed when the ADP is approved if the

conditions are consistent with the terms of the lease.  *See* 30 U.S.C. § 226(g); *see*

*also* 43 C.F.R. § 3162.3-1(h).

### C.     The Oil and Gas Leases at Issue in this Case

In 2008, BLM sold 61 oil and gas leases on 25,329 acres in Montana,

through four separate lease sales. Plaintiffs challenged the lease sales in federal

court in Missoula, *Montana Environmental Information Center. v. BLM*, CV-08-

178-M-DWM. The case was resolved in a court-approved settlement on March

11, 2010.[3] Under the settlement agreement, BLM agreed to suspend the 61 oil and

gas leases while it conducted further EAs to assess its leasing decision.[4] Separate

EAs were conducted by field offices in Billings, Butte, Dillon, Lewistown, Malta,

and Miles City which addressed the leases in those respective areas.[5] BLM also

contracted with URS Corporation for preparation of a comprehensive

Supplementary Information Report (SIR) addressing climate change impacts

associated with oil and gas development in Montana, North Dakota and South

Dakota.[6] The SIR was incorporated by reference into each of the EAs.[7]

The EAs were reviewed. It was determined appropriate to lift the

suspension entirely on 45 of the 61 leases sold in 2008,[8] and to partially lift the

suspension on two of the leases sold in 2008. It was also found appropriate, based

---

[3] Administrative Record (AR) at 11943.

[4] AR 11943.

[5] AR 00009, 00260, 00505, 00726, 00952, 01114.

[6] AR 1412-1581.

[7] *See* e.g., EA prepared by BLM Field Office in Miles City. AR 1133.

[8] AR 11943.

7

upon the EAs, to execute 73 new oil and gas leases in Montana and make them available for sale in December 2010.

Each EA considered two alternatives: (1) a "no action" alternative; and (2) a BLM "preferred alternative" that contemplated the leases would be executed subject to BLM's standard stipulations. Plaintiffs' proposed alternative which called for additional stipulations to be inserted into each lease requiring each lessee to take steps to minimize or prevent GHG emissions were not accepted. The alternative was rejected because it was concluded that GHG emissions could be more effectively managed by imposing appropriate conditions of approval on the lessees during the lease permit phase.[9]

BLM further concluded, based upon the EAs and the SIR, that it was not required to prepare an EIS for any of the oil and gas leases at issue because:

      1.    The quantity of GHG that would be emitted from the lease sites would be so minuscule that it would have no significant impact on the environment;[10] and

      2.    An EIS would provide no meaningful assistance because current science could not predict how GHG emissions emitted from the lease sites would affect climate change in Montana because GHG emissions disperse globally, not locally.

---

[9] AR 1179-81.

[10] AR 1110, 1199-1200.

Each BLM office prepared a FONSI in lieu of an EIS.[11]  The FONSIs set forth

BLM's reasons for not preparing an EIS.

The 73 new leases, totaling 53,991 acres, were offered for sale on December

9, 2010.[12]  A portion, 53, were purchased.  The 53 leases purchased covered

33,257 acres.  The successful bidders acquired lease rights to pursue development

of oil and gas wells on the leased properties.

Plaintiffs filed a timely protest to the decisions to execute and sell the

leases.[13]  The protest was denied on December 27, 2010.[14]  This lawsuit followed.

The American Petroleum Institute, Montana Petroleum Association, Montana

Chamber of Commerce and the Western Energy Alliance were granted

intervention on May 24, 2011.

Plaintiffs challenge both BLM's decision to lift the suspension on the 47

leases sold in 2008, and the decision to offer 73 new leases for sale in December

2010.  They alleged in the Complaint that the leasing decisions violated NEPA

_____

[11] *See* FONSIs prepared by BLM field offices in Billings, Butte, Dillon, Lewistown, Malta, and Miles City — AR 00005, 00501, 00727, 00948, and 01110, respectively.

[12] AR 7552.

[13] AR 11944.

[14] AR 11942-69.

procedure because:

1.  BLM failed to consider their proposed alternative of inserting additional stipulations in each oil and gas lease that would require each lessee to take steps to minimize or prevent GHG emissions;[15]

2.  BLM failed to take a hard look at the cumulative environmental impacts of its leasing decisions;[16]

3.  BLM failed to prepare an EIS for the leases at issue;[17] and

4.  The FONSIs prepared by BLM were inadequate as they failed to include a convincing statement of reasons for the decision to forgo preparation of an EIS.[18]

They claimed that BLM's failure to follow NEPA procedures will result in

climate-change-related injuries on properties near the lease sites,[19] and requested

---

[15] Document 1 at ¶¶ 147-58.

[16] Document 1 at ¶¶ 171-79. As discussed above, the purpose of an EA is to determine whether the proposed agency action will have a significant impact on the environment. The EA focuses on the context and intensity of the proposed action. In determining intensity, the agency is to consider, *inter alia*, whether the proposed action is related to other actions which, taken together, would have "cumulatively significant impacts" on the environment. 40 C.F.R. § 1508.27(b)(7). Plaintiffs claim that BLM violated NEPA procedure because it failed to take a hard look at the "cumulative impacts of oil and gas development, GHG pollution, and climate change." Document 1 at ¶ 177.

[17] Document 1 at ¶¶ 162-67, 170. Plaintiffs claim an EIS was required because BLM's leasing decisions will have a significant impact on the environment.

[18] Document 1 at ¶¶ 168-70.

[19] Plaintiffs claim that BLM's failure to insert stipulations in each lease requiring lessees to minimize or prevent GHG emissions will result in excessive amounts of methane gas being

that the Court (1) declare the BLM's actions violate NEPA and (2) enjoin the oil
and gas leases pending full compliance with NEPA.[20]  BLM and the Defendant-
Intervenors, on the other hand, have requested dismissal on grounds that (1)
Plaintiffs lack standing to assert the claims and (2) the claims otherwise lack merit.

Cross-motions for summary judgment were filed by all parties.  A hearing
was conducted on May 24, 2013.  The motions are ripe for resolution.  The Court
has jurisdiction under 28 U.S.C. § 1331.

## STANDARD OF REVIEW

### APA Standard

Judicial review in this matter may proceed only under the APA.  There is no
private right of action under NEPA.  *ONRC Action v. BLM*, 150 F.3d 1132, 1135
(9th Cir. 1998).  Agency decisions can only be set aside if they are "arbitrary,
capricious, an abuse of discretion, or otherwise not in accordance with

---

emitted from the lease sites, which will contribute to global warming and climate change in
Montana.  Plaintiffs further claim that the resultant change in the local climate will injure their
aesthetic and recreational interests in lands near the lease sites by, *inter alia*, melting glaciers,
warming streams (which will cause trout populations to decline), and by drying forests (which
will lead to beetle infestations).

It is imperative to note that all of Plaintiffs' claims are based upon climate change
impacts.  Plaintiffs do not assert claims based solely upon surface disturbance or on-the-ground
activities associated with oil and gas development that are wholly independent of alleged climate
change impacts.

[20] Document 1 at ¶ 40.

11

law." 5 U.S.C. § 706(2)(A).

## Summary Judgment Standard

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Here, the facts are settled in the administrative record. This Court must address only the legality of BLM's actions. Summary judgment on issues of APA and statutory compliance is appropriate.

## DISCUSSION

## Standing

The judicial power of federal courts is limited by Article III of the Constitution to the resolution of cases and controversies. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). A party must show that it has standing to establish the existence of such a case or controversy. *Gettman v. DEA*, 290 F.3d 430, 433 (D.C. Cir. 2002). Plaintiffs, as the parties invoking federal jurisdiction, bear the burden of proving standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The burden of production on standing is the same as that of Plaintiffs moving for summary judgment. They must support each element of standing by affidavit or other evidence. *Citizens Against Ruining the Env. v. EPA*, 535 F.3d 670, 675 (7th

12

Cir. 2008). Plaintiffs "must either identify in the [administrative] record evidence sufficient to support its standing to seek review or, if there is none because standing was not an issue before the agency, submit additional evidence" to substantiate their standing. *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002).

Article III standing has three elements: (1) injury-in-fact; (2) causation; and (3) redressability. *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 102-03 (1998). All must be demonstrated to establish standing.

Injury-in-fact requires proof of invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Summers v. Earth Is. Inst.*, 555 U.S. 488, 493 (2009). Causation requires proof of a causal connection between the injury alleged and the conduct of the defendant. *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 (9th Cir. 2011). The injury must be fairly traceable to the challenged action of the defendant, and not some third party not before the Court. *Id.* Redressability requires a showing that it is likely, as opposed to speculative, that the claimed injury will be redressed by a favorable decision. *Id.* If, as here, an organization is suing on behalf of its members, it must be shown that members of the organization meet the threshold standing requirements. *See Wilderness Socy., Inc. v. Rey*, 622

13

F.3d 1251, 1256 (9th Cir. 2010).

**Injury-in-Fact**

Plaintiffs assert standing based upon procedural violations of NEPA.  To establish a procedural injury-in-fact, Plaintiffs must demonstrate: (1) that BLM violated a procedural rule; (2) that the procedural rule is designed to protect a concrete interest belonging to Plaintiffs; and (3) it is reasonably probable that BLM's action will threaten Plaintiffs' concrete interests.  *Vilsack*, 636 F.3d at 1171; *Citizens for Better Forestry v. U.S. Dept. of Agric.*, 341 F.3d 961, 969-70 (9th Cir. 2003).  All of the components must be present.  Each is addressed below.

**1.     Violation of a Procedural Rule**

Plaintiffs claim that BLM violated NEPA's procedural rules: (1) by failing to consider their proposed alternative to insert additional stipulations in each lease that would require the lessee to take steps to minimize or prevent GHG emissions; (2) by failing to take a hard look at the cumulative impacts of its leasing decisions; (3) by failing to prepare an EIS for the oil and gas leases; and (4) by preparing inadequate FONSIs that did not include a convincing statement of reasons for its decision to forgo preparation of an EIS.

The Court assumes, for the limited purpose of standing analysis only, that a procedural rule violation may have occurred.  That assumption, however, does not

14

end the inquiry.

## 2.      Concrete Interests

A procedural rule is said to protect plaintiffs' "concrete interests" if it is
shown that a nexus exists between plaintiffs and the location suffering the
environmental impact. *Vilsack*, 636 F.3d at 1172; *W. Watersheds Project v.
Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011). Address of that issue follows.

Plaintiffs have submitted declarations from five members who state, *inter
alia*, that they have recreational and aesthetic interests in public and private lands
located near the oil and gas leaseholds at issue that may be injured by the
development of the leases and by the release of methane gas from the oil and gas
wells.[21] Aesthetic and recreational interests in land are considered concrete
interests for purposes of standing. *Friends of the Earth, Inc. v. Laidlaw Envtl.
Services (TOC), Inc.*, 528 U.S. 167, 182-83 (2000). Plaintiffs adequately allege
concrete interests when their members aver, in sworn declarations, "that they use
the affected area and are persons for whom the aesthetic and recreational values of
the area will be lessened by the challenged activity." *Id.* at 183. The concrete
interest requirement is satisfied.

---

[21] *See* Documents 35-1, 2, 4, 5, 6, and 55-2.

### 3.   <u>Threat of Harm to Concrete Interests</u>

The final prong of the injury-in-fact analysis must be established by proof.

Plaintiffs must demonstrate that it is reasonably probable that defendants' failure

to follow proper NEPA procedures will result in an environmental threat to their

concrete interests. *Vilsack*, 636 F.3d at 1171-73; *Amigos Bravos v. BLM*, 816 F.

Supp. 2d at 1118, 1129 (D. N.M. 2011); *Citizens for Better Forestry*, 341 F.3d at

969, 972.[22]

Plaintiffs claim to have met the threat of harm requirement by assertions, in

the member declarations, that BLM's failure to follow NEPA procedures will

result in methane gas being emitted from the oil and gas leases at issue, and that

the release of methane gas will cause global warming and climate change, which,

in turn, will present a threat of harm to their aesthetic and recreational interests in

lands near the lease sites by melting glaciers, warming streams and promoting

beetle-killed forests.  There remains, however, a fundamental disconnect between

Plaintiffs' assertions and the proof necessary to establish reasonable probability of

threat to concrete interests.  Plaintiffs' recreational and aesthetic interests are

---

[22] Because Plaintiffs allege a procedural violation of a federal statute, as opposed to a substantive violation, the "immediacy" component of standing which normally applies, is relaxed.  *Mass. v. EPA*, 549 U.S. 497, 517-18 (2007).  Plaintiffs enforcing a procedural right need not demonstrate that the alleged harm is imminent.  *See Cantrell v. City of Long Beach*, 241 F.3d 674, 679 n. 3 (9th Cir. 2001).

uniformly local.  The effects of GHG emissions are diffuse and unpredictable.  *See*

*WildEarth Guardians v. Salazar*, 880 F. Supp. 2d 77, 84 (D. D.C. 2012).

Other courts have noted the difficulties that arise when plaintiffs claim their

localized interests will be affected by agency action that allegedly contributes to

GHG emissions.  *See id.*; *see also Amigos Bravos*, 816 F. Supp. 2d at 1129

("[W]hile there may be a generally accepted scientific consensus with regard to

global climate change, there is not the same consensus with regard to what the

specific effects of climate change will be on individual geographic areas.").

Plaintiffs have presented no scientific evidence or recorded scientific observations

to support their assertions that BLM's leasing decisions will present a threat of

climate change impacts on lands near the lease sites.  None of the member

declarants asserts that he is in an expert in a relevant scientific field.  Statements

made by declarants who lack factual support or a basis in science are pure

conjecture, constitute inadmissible opinion testimony, and are not sufficiently

reliable or trustworthy to establish injury-in-fact.  *See Lujan*, 504 U.S. at 561

("each element [of standing] must be supported in the same way as any other

matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and

degree of evidence required at the successive stages of the litigation").  At the

summary judgment stage of the litigation, plaintiffs must come forward with more

17

than just bare assertions of perceived climate change impacts. Specific facts are

required. *Id.* Plaintiffs have failed to demonstrate that BLM's alleged failure to

follow proper procedure created an increased risk of actual, threatened, or

imminent harm to their recreational and aesthetic interests in lands near the lease

sites. Injury-in-fact has not been established.

## Causation

Plaintiffs must show that there exists a "reasonable probability" that the

threat of harm they wish to avoid (adverse climate change impacts on the local

Montana environment) is causally linked to the challenged action of BLM (the

issuance of the oil and gas leases in 2008 and 2010), and not the independent

action of some third party not before the Court. *See Bennett v. Spear*, 520 U.S.

154, 167 (1997); *see also Lujan*, 504 U.S. at 560-61. In other words, Plaintiffs

must show that climate change impacts on the local environment are "fairly

traceable" to methane emissions from the lease sites at issue. *Bennett*, 520 U.S. at

167. This task requires Plaintiffs to show that GHG emissions from the lease sites

will make a "meaningful contribution" to global GHG levels and that a nexus

exists between the anticipated GHG emissions and injuries to the specific

geographical area of concern. *See Amigos Bravos*, 816 F. Supp. 2d at 1134-36

(citing *Mass.*, 549 U.S. at 523-25). The required causal link cannot be established

18

by merely showing that methane emissions from lease sites will make an infinitesimal contribution to global GHG levels, as "anyone could be liable for the most innocuous of acts — driving to work, watching the television or [turning] on a light" — as all contribute to global warming and climate change. *See id.* at 1136.

Plaintiffs have failed to meet this burden as they have made no attempt to show that methane emissions from the lease sites at issue will make a meaningfully contribution to global GHG emissions or to global warming. Instead, they focus on the total volume of methane gas that may be emitted annually from all oil and gas wells on BLM lands in North Dakota, South Dakota, and Montana (8,000,000 metric tons), from which Plaintiffs argue that this volume of methane (which is equivalent to the emissions of approximately 1,000,000 automobiles) would make a meaningful contribution to global warming.

The majority of the oil and gas leases at issue were executed by BLM's field office in Miles City. The potential methane emissions from these leases is approximately 7,330 metric tons per year.[23] This volume of methane gas is so small that it amounts to only .02 percent of the total GHGs emitted in Montana in

---

[23] AR 1178.

2005,[24] only .00011 percent of the GHG emitted in the United States each year,[25] and only .000015 percent of the GHGs emitted worldwide each year.[26] It cannot be said that methane emissions from the leases at issue would make a meaningful contribution to global GHG levels. The requisite causal connection has not been established. *See id.* (methane emissions from 92 oil and gas leases, which amounted to 254,730 metric tons of gas annually, and .0009 percent of total global GHG emissions, were so infinitesimal that they did not make a meaningful contribution to global GHG levels); *see also WildEarth Guardians*, 880 F. Supp. 2d at 83-86 (Plaintiffs failed to satisfy causation requirement for climate-change-related injuries when they were unable to show that anticipated GHG emissions from coal mining operations on leased public lands, would yield a "demonstrable increase in risk" to their recreational and aesthetic interests in lands adjacent to the coal lease tracts).

## Redressability

As noted, redressability as a component of standing, requires Plaintiffs to establish that it is likely, as opposed to speculatively, that the claimed injury will

---

[24] AR 1199, 11956.

[25] AR 1199.

[26] AR 1199-1200.

be redressed by a favorable decision.  *Summers*, 555 U.S. at 493; *Vilsack*, 636 F.3d at 1171.  Failure to establish injury-in-fact moots any obligation by the Court to consider redressability.  Without injury there is nothing to redress.

## CONCLUSION

Plaintiffs have failed to show they have standing before this Court.  They have not demonstrated that the sale of the oil and gas leases at issue will lead to climate change impacts resulting in injury to their recreational and aesthetic interests in lands near the leases.

## ORDER

1.      Defendant BLM's Cross-Motion for Summary Judgment[27] is GRANTED.

2.      Defendant Intervenor's Cross-Motion for Summary Judgment[28] is GRANTED.

3.      Plaintiffs' Motion for Summary Judgment[29] is DENIED.

4.      This case is DISMISSED.

---

[27] Document No. 50.

[28] Document No. 41.

[29] Document No. 34.

5.      The Clerk is directed to enter judgment accordingly.

DATED this _____14th_____ day of June, 2013.

SAM E. HADDON
United States District Judge